**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **PEYMAN FARZINPOUR,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.** |
| | : | |
| -against- | : | **COMPLAINT** |
| | : | |
| **BERKLEE COLLEGE OF MUSIC, and** | : | **JURY TRIAL DEMANDED** |
| **BERKLEE BOARD OF TRUSTEES,** | : | |
| | : | |
| **Defendants.** | : | |

_____

Plaintiff Peyman Farzinpour ("Plaintiff" or "Farzinpour" or "Professor Farzinpour"), by his attorneys Nesenoff & Miltenberg, LLP, and by Jeannie Suk Gersen, as and for his Complaint, respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.     This case arises out of the actions taken and procedures employed by Berklee College of Music ("Berklee" or "the College") as a result of false allegations of sexual harassment made by a Berklee student against Plaintiff Peyman Farzinpour.

2.     In investigating and adjudicating the false allegations against Professor Farzinpour, an accomplished and respected musician, conductor, composer, and professor, Berklee deprived Plaintiff of basic fairness when it conducted a disciplinary process that was neither thorough nor impartial, exhibited gender bias against Professor Farzinpour as an accused male employee, and deprived him of his basic rights to a fair proceeding, including access to evidence and the opportunity to be heard by an impartial decisionmaker. At the end of its biased and unfair investigation, Berklee imposed a suspension on Professor Farzinpour for thirty (30) days without compensation.

1

3.     Within weeks of his return to teaching after completing the suspension, Plaintiff Farzinpour was suddenly and wrongfully terminated from his employment altogether, without notice or allegation of a policy violation, opportunity to be heard, investigation, or any process whatsoever.

4.     A non-exhaustive list of Defendant Berklee's wrongful actions includes the following: (i) failure to afford a fair and unbiased investigation, (ii) failure to make any attempt to obtain and consider potentially exculpatory evidence requested by Plaintiff, (iii) failure to apply the requisite standard of evidence, (iv) failure to interview relevant witnesses to corroborate his account of the events that transpired, (v) failure to respond to retaliatory conduct against Plaintiff, (vi) permitting breach of confidentiality in the investigatory process, (vii) failure to expeditiously conduct the investigation in the specified time period, (viii) wrongfully suspending Plaintiff without providing him a meaningful opportunity to defend himself against the conduct alleged, and (ix) ultimately terminating Professor Farzinpour without notice, opportunity to be heard, investigation, or proceeding of any kind.

5.     As a result of Defendants' discriminatory and unlawful conduct, Plaintiff Farzinpour was placed on an involuntary leave, suspended without pay for thirty (30) days, and eventually terminated from employment.

6.     Plaintiff, therefore, brings this action for relief based on causes of action for violations of Title IX, breach of contract, denial of basic fairness/arbitrary and capricious decision-making, and other state law causes of action.[1]

---

[1] Plaintiff is simultaneously filing charges of employment discrimination with both the Equal Employment Opportunity Commission and the Massachusetts Commission Against Discrimination, and intends to amend the Complaint to include relevant federal and state claims once he receives a right to sue.

## THE PARTIES

7.      Plaintiff Peyman Farzinpour is a resident of the State of Rhode Island. At all relevant times, Plaintiff Farzinpour was employed by Defendant Berklee College.

8.      Upon information and belief, Defendant Berklee College of Music is a private college located in Boston, Massachusetts, with an additional campus in Valencia, Spain.

9.      Upon information and belief, Defendant Berklee Board of Trustees is the governing body of Berklee.

## JURISDICTION AND VENUE

10.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331–1332, 1367 (2018) because: (i) the federal law claim arises under the Constitution and statutes of the United States, (ii) the parties are citizens of different states, and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendant Berklee on the grounds that it conducts business within the Commonwealth of Massachusetts.

12.     This Court has personal jurisdiction over Defendant Berklee Board of Trustees on the grounds that it is the governing body of Berklee and, thus, conducts business within the Commonwealth of Massachusetts.

13.     At all relevant times, the actions and events discussed herein transpired within the Commonwealth of Massachusetts.

14.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Berklee College is considered to reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.     Berklee Has Faced Public Pressure on Sexual Harassment Complaints**

15.     On April 4, 2011, the Office for Civil Rights ("OCR") in the United States Department of Education ("DOE") issued a guidance document on sexual violence, the "Dear Colleague Letter" ("DCL"), U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf     [hereinafter     *Dear Colleague Letter* or *DCL*], interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its regulations, 34 C.F.R. Part 106 (2018). Title IX's regulations require colleges and universities to have prompt and equitable grievance procedures to resolve complaints of sex discrimination, including sexual harassment. While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, limiting cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

16.     In a related guidance document published on April 29, 2014, the U.S. Department of Education, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter 2014 Q&A], OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

17.     In June 2014, the DOE's Assistant Secretary for Civil Rights, Catherine Lhamon, testified before the United States Senate that if OCR could not secure voluntary compliance with its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. *Sexual Assault on Campus: Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. (2014) (statement of Catherine E. Lhamon, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ.).

18.     In June 2014, Berklee became the subject of an OCR investigation regarding its handling of sexual harassment complaints. *See* Matt Rocheleau, *Berklee Is Subject of Sexual-Assault Investigation*, Bos. Globe (June 30, 2014, 6:03 PM), https://www.bostonglobe.com/metro/2014/06/30/berklee-becomes-latest-area-college-face-federal-sexual-assault-investigation/n5lpYkb0DvzYxn2omOKNaK/story.html. The case was resolved in September 2017.

19.     In November 2017, the *Boston Globe* reported that Berklee pressured students to remain silent about sexual harassment by professors. *See* Kay Lazar, *Berklee Let Teachers Quietly Leave After Alleged Sex Abuse, and Punished Students for Silence*, Bos. Globe (Nov. 8, 2017, 9:24 AM), https://www.bostonglobe.com/metro/2017/11/08/berklee-college-lets-teachers-quietly-leave-after-alleged-sexual-abuse-students-least-one-found-another-teaching-job/yfCkCCmdJzxkiEgrQK4cWM/story.html.

20.     In the past decade, universities across the country have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

21.     On September 22, 2017, OCR rescinded its 2011 DCL and its 2014 Q&A and noted that the agency had been widely criticized for putting "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." U.S. Department of Education, *Dear Colleague* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

22.     OCR put in place an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter 2017 Q&A], while the agency conducted a rulemaking process that would eventually lead to binding Title IX rules. The 2017 Q&A, which was in effect during the events at issue in this Complaint, required that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

23.     In March 2020, printed signs listing several male Berklee professors' names, including that of Professor Farzinpour, were plastered around Berklee's campus and on various streets throughout Back Bay, with the following text at the bottom: "We will not be silenced."

24.     On March 16, 2020, the Boston Globe published an article about sexual harassment allegations against several male professors at Berklee, including Professor Farzinpour.

25.     On March 17, 2020, Roger Brown, the President of Berklee College, sent an email to the entire Berklee community about the Boston Globe article. He stated his "unwavering commitment to eliminating harassment and misconduct from our campus, and apologize to anyone who has experienced mistreatment at Berklee." He wrote, "Students, we know you are

frustrated. . . . Reports to our Equity Team—and their subsequent investigations into allegations—allow us to take action." President's Email to Berklee, March 17, 2020.

26.     On May 6, 2020, the Department of Education released its final regulations on Title IX, which are set to take effect on August 14, 2020.[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). The regulations make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided a live hearing with cross-examination and access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial; and must explain delays for good cause in the timeframe of the process in writing.

## II.     Professor Farzinpour's Background and Career

27.     Professor Farzinpour is an American of Iranian and Jewish background. He fled Iran as a child with his family during the Iranian Revolution in 1979 to avoid religious persecution and violence. He and his family began anew as refugees in the United States. They settled in California, where Plaintiff received his elementary and high school education.

28.     Professor Farzinpour received a Bachelor of Music in Classical Guitar Performance from the Peabody Conservatory, a Bachelor of Arts in English Literature from Johns Hopkins University, and a Master of Arts in Composition from the University of California, Davis. He

---

[2] The DOE published the final regulations in the *Federal Register* on May 19, 2020.

continued his post-graduate education in Milan, Italy, studying conducting for three years at the Civica Scuola di Musica Claudio Abbado.

29.     An accomplished composer, conductor, and educator, Professor Farzinpour has enjoyed a diverse musical career. His achievements include sold-out performances throughout the United States, Canada, and Europe, grants for novel projects in music, and conducting a critically acclaimed world premiere opera in New York.

30.     Professor Farzinpour is the Artistic Director and Conductor of the innovative and award-winning contemporary music and multimedia group, ENSEMBLE / PARALLAX, which tours regularly throughout the United States.

31.     Professor Farzinpour was trained and mentored by a famed conductor who incorporated techniques drawn from Buddhist philosophy into his approach to music performance, which was helpful to overcoming anxiety and stage fright. Professor Farzinpour is, therefore, a serious practitioner of meditation, mindfulness, and yoga, and has traveled abroad for intensive retreats to learn and further his practice. He incorporates the practices into his musical conducting and teaching, in the classroom and in mentoring musicians. He draws on mindfulness techniques to help students train to combat the nervousness, tension, and stage fright that may keep musicians from being fully present while performing music.

32.     In the Fall of 2014, Professor Farzinpour began teaching as an Assistant Professor at Berklee in the Composition department. Since then until the Summer of 2019, he always taught throughout the Fall, Spring, and Summer semesters. Professor Farzinpour taught courses primarily in conducting, and other courses including, but not limited to, music history, composition, harmony, and counterpoint.

33.     As Professor Farzinpour proved to be a skilled and popular teacher, Berklee quickly gave him a full teaching load. Throughout his employment at Berklee, he received exceptional reviews from students for his teaching. His courses always enrolled quickly upon opening and filled to capacity.

34.     Professor Farzinpour was promoted from Assistant Professor to the rank of Associate Professor, effective from the Fall of 2019.

35.     At Berklee, Professor Farzinpour received several awards and grants for his innovative projects and endeavors, including one of the highest awards available to a professor, the Berklee Faculty Fellowship Grant.

### III.     Plaintiff Farzinpour's Contract with Berklee

36.     Upon commencing employment in September 2014, Professor Farzinpour signed a contract with Berklee regarding the conditions of his employment. He signed a renewed contract on May 10, 2018 for the term of September 1, 2018 through May 31, 2021.

37.     Professor Farzinpour's employment contract provided that his appointment was "made in accordance with and governed by the policies of the Board of Trustees and the College," and that "acceptance of this appointment includes the acceptance of these policies."

### A.     *Berklee's Non-Discrimination, Harassment, and Sexual Misconduct Equity Policy and Process*

38.     Berklee's Non-Discrimination, Harassment, and Sexual Misconduct Equity Policy and Process (the "Policy"), which applies to "[a]ll members of the Berklee community . . . including students, faculty, and staff," was in effect before and during the 2019–2020 academic year. *Berklee Non-Discrimination, Harassment, and Sexual Misconduct Equity Policy and Process*, Berklee, 1, https://www.berklee.edu/sites /default/files/Berklee%20Equity%20 Policy%20and%20Process.pdf [hereinafter *Berklee's Policy*].

39.     The Policy "prohibits acts of discrimination, harassment, and sexual misconduct, including, but not limited to, sexual assault or harassment, domestic/dating violence, and stalking." *Id.* The Policy states its commitment to "fostering a safe, supportive, and diverse climate" where "all can study, live, and work together in an environment of equal opportunity, inclusiveness, and mutual respect." *Id.*

40.     The Policy states that "Berklee adheres to ***all*** federal and state civil rights laws barring discrimination, including, but not limited to Title IX . . . of the Education Amendments of 1972, Title VII of the Civil Rights Act of 1964, . . . and the Massachusetts Equal Rights Law." *Id.* (emphasis added). Additionally, the Policy states Berklee's commitment to "promoting a culture that is in line with the values these civil rights laws envision." *Id.*

41.     Conduct that is subject to the Policy is described as: "Conduct that occurs on campus" and "[c]onduct that occurs off campus" when it "occurs in the context of an employment or educational program or activity of Berklee; has the effect of continuing adverse effects on campus, including adverse impact on any member of the Berklee community or Berklee itself; has continuing adverse effects in an off-campus employment or education program or activity, such as . . . research [or] performances . . . ; causes concern for the safety or security of Berklee's campus; or has, or may have, the effect of contributing to or continuing a hostile environment in a Berklee program or activity." *Id.* at 2.

42.     The Policy defines "discrimination" as "any conduct that excludes an individual from participation, denies the individual benefits, treats the individual differently, or otherwise adversely affects a term or condition of an individual's employment, education, living environment, or participation in a Berklee program on the basis of the affected individual's actual

or perceived protected characteristic." *Id.* at 3. Examples of discrimination include "denying an employee a promotion because of the employee's . . . protected characteristic." *Id.*

43.     The Policy defines "harassment" as "unwelcome, offensive conduct that occurs on the basis of the affected individual's actual or perceived protected characteristic," which "often takes the form of degrading or hostile behavior, and has the purpose or effect of unreasonably interfering with the individual's employment or education, or creating a hostile, intimidating, or offensive working, living, or learning environment." *Id.*

44.     The Policy states that "[t]he fact that a person was personally offended by a statement or incident does not alone constitute harassment in violation of this policy. Whether harassment occurred is measured from both an objective (reasonable person's view) and subjective (the reporting party's view) standard, and depends on the totality of the circumstances, including: the context of a communication or incident; the relationship of the individuals involved; whether an incident was isolated or part of a course of conduct; the seriousness or severity of the incident; the intent of the individual who engaged in the offensive conduct; and its effect or impact on the individual and the working or learning community." *Id.*

45.     The Policy states that "sexual harassment" involves "unwelcome or unwanted conduct of a sexual nature," including "unwelcome sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature," and specifies that it "can be directed toward a person of any sex/gender by someone of any sex/gender." *Id.* at 4. Examples of "unwelcome or unwanted conduct" include: "Lewd remarks . . . or personal reference to one's anatomy," "[s]ubtle or overt pressure for sexual favors," "[u]se of sexual epithets, . . . references to sexual conduct, gossip regarding one's sex life, and comments on an individual's body, sexual

activity, deficiencies or prowess, and/or conformity to expected notions of gender," "[s]exual exhibitionism," and "[i]nquiries into one's sexual activities." *Id.*

46.     The Policy continues to outline that sexual or gender-based harassment can unreasonably interfere "with an individual's work or academic performance if, for example, it is sufficiently, serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, discriminatory, or sexually offensive working, academic, residential, or social environment under both an objective (reasonable person's view) and subjective (the reporting party's view)."

47.     The Policy also prohibits retaliation, which is defined as "any conduct or behavior that interferes with a person's rights and ability to pursue both internal disciplinary processes and charges through external law enforcement authorities, as well as rights to access education and/or work. . . . Retaliation includes taking, or causing third parties to take, any such action. Retaliation against a reporting party or witness may be violating Berklee policy and the law, even if the original complaint of misconduct cannot be substantiated." *Id.* at 8.

48.     The Policy prohibits "retaliation against any person who, in good faith, reports, assists in reporting, or participates in an investigation of possible discrimination, harassment, or sexual or gender-based misconduct. Retaliation against an individual for reporting a complaint or concern about a violation or suspected violation of this policy, for supporting a reporting party, or for assisting in providing information in the context of an investigation or disciplinary proceeding pursuant to this policy is a serious violation of Berklee's policy and will be subject to discipline pursuant to this policy and the Equity Complaint Process." *Id.*

49.     The Policy instructs that "[i]ncidents of suspected retaliation should be reported to the investigator(s) assigned to the matter or to any individual identified below in the Formal Reporting to Berklee section." *Id.*

50.     When a complaint under the Policy arises "where the Chief Equity Officer/Title IX Coordinator determines that a complaint appears to allege a policy violation and a reporting party wishes to pursue a formal complaint," he or she "appoints trained, impartial individual(s) to conduct the investigation." *Id.* at 14.

51.     The Policy provides that "[t]he investigator is responsible for communications with the parties regarding the initiation and progress of the investigation," and that "[p]rior to initiating the investigation, the investigator will meet separately with each party to review applicable policy, procedures, rights, and other expectations related to the investigation." *Id.* at 15.

52.     The Policy promises that "[t]he investigator will provide the responding party with written notice of all allegations, in a charge letter and/or written complaint, prior to the initial interview." *Id.* Should "new information come to light that results in the need to charge the responding party with additional violations," the Policy promises, "the parties will be provided with an updated, written letter setting forth the new allegations." *Id.*

53.     The Policy allows both complainant and respondent to be advised by an advisor of their choice. "Advisors serve as a support person [sic] for the parties during investigative meetings." *Id.*

54.     Pursuant to the Policy, "[t]he investigator will interview the parties, as well as all relevant witnesses, and gather any relevant evidence (such as texts/emails, social media postings, surveillance video, photos), and consider all relevant evidence." *Id.*

55.     The Policy provides that, in general, "the investigator will not consider character evidence, incidents not directly related to the possible violation unless they tend to show a pattern, past sexual history, or sexual character of either party." *Id.*

56.     The Policy promises that "[t]he investigation will be thorough, impartial, and fair, and all individuals will be treated with appropriate sensitivity and respect." *Id.*

57.     The Policy promises that "[d]uring the investigation, the parties will have an equal opportunity to share information and request that witnesses be interviewed. The parties will ***not*** be interviewed together or be required to meet." *Id.*

58.     The Investigator, in most cases, "will prepare a written summary of the evidence to be considered at the conclusion of an investigation." *Id.* The Policy requires that "[b]efore a determination is made," the parties "be given the opportunity to review a summary of relevant evidence, including their own statements," and be permitted to "submit any comments about this summary to the investigator within five (5) calendar days." *Id.* at 15–16.

59.     The Policy states that "[t]he investigator will then review all relevant evidence and determine whether or not the responding party is responsible or not responsible for each allegation, using a preponderance of the evidence standard," and that "[t]he investigator will then amend the summary report, including rationale and conclusions, for review by the Chief Equity Officer/Title IX Coordinator." *Id.* at 16.

60.     The Chief Equity Officer/Title IX Coordinator is required to "oversee each investigation and ensure sufficiency of evidence gathered, that the facts gathered support the findings, that best practices are followed, and that each allegation is addressed in the investigator's summary report." *Id.*

61.     Upon a finding that a respondent violated the Policy, possible sanctions include "mandated education, a formal warning, probation, suspension, expulsion (for students), or corrective action up to and including termination (for employees)." *Id.* For respondents who are staff or faculty, potential sanctions also include "[n]o contact orders; [m]andated counseling, education, and/or training; [v]erbal warning; [w]ritten warning; [f]inal written warning; [s]uspension; [i]nvoluntary termination." *Id.*

62.     When determining and issuing appropriate sanctions, the Chief Equity Officer/Title IX Coordinator is "guided by a number of factors, including but not limited to the nature, severity, and circumstances of the violation; disciplinary history and previous acts of similar misconduct; the need for sanctions to bring an end to and prevent recurrence of discrimination, harassment, or retaliation; the need to remedy the effects of the discrimination, harassment or retaliation on the reporting party and the community; and any other factors deemed relevant." *Id.* at 17.

63.     "The Chief Equity Officer/Title IX Coordinator may consult with the Investigator and/or deputy for equity investigations on any sanctioning decisions." *Id.* When the respondent is a faculty member, "a dean or other individual designated by the provost will be consulted in an advisory or consultative capacity." *Id.*

64.     The Chief Equity Officer/Title IX Coordinator or designee must notify the parties of the outcome and sanctions "in writing, on the same day," and include in this notification both "a summary of the investigative report and sanctions determination," and "a summary of the factors the Chief Equity Officer/Title IX Coordinator considered in determining the sanction(s)." *Id.* at 19.

65.     The Policy promises that "Berklee will conduct a timely review of all complaints and will endeavor to complete review and resolution within sixty (60) calendar days from receipt

of the complaint to notification of outcomes." *Id.* The Policy notes that "due to specific case circumstances," Berklee may need to "extend these time frames." *Id.* The Policy further notes that "[i]n the event that such time frames will not be met, the parties will be kept informed." *Id.*

66.     After the outcome and sanctions are issued, the complainant and the respondent "have equal rights to an impartial appeal." *Id.* at 20.

67.     The only permitted grounds for appeal are: (i) "The appellant alleges that new evidence is available that was not available prior to the original investigation and finding and that this new evidence may have a material effect on the case," (ii) "the appellant alleges that the investigation process was not adhered to and that such non-adherence may have had a material impact," or (iii) "the appellant alleges that the sanctions assigned are disproportionate to the violation or to the sanctions issued to others who were found to be responsible for substantially similar violations." *Id.*

68.     The Policy provides that the appeal is "conducted in writing." Parties must also submit the appeal within "ten (10) business days from written notification of an outcome" and "include any and all information they would like to have considered." *Id.*

69.     The deputy for appeals will "determine whether or not the appellant has provided sufficient grounds for review," in most cases, within ten days of receipt of an appeal. *Id.* If the deputy for appeals decides that sufficient grounds for review exist, "the appeal will be decided by an appeal panel of three trained administrators, including the deputy for appeals." *Id.*

70.     The Policy states that the appeal panel "is not intended to conduct a full review of the case" and that the panel typically reviews "the appeal, any response received, the outcome letter, and the case summary prepared by the investigator." *Id.* at 20–21.

71.     Notably, the appeal panel does not review all documents and evidence compiled from the investigation. Rather, the appeal panel "may only make changes to the original outcome when at least one of the specified grounds for appeal is met." *Id.* at 21.

72.     The appeal panel may (i) determine the original decision stands because "no grounds for appeal have been met"; (ii) "determine that grounds for appeal have been met" and remand back to an investigator to address the appealed aspects of the case; or (iii) make new findings of fact, responsibility, and sanction. *Id.*

B.  *Berklee's Relationships Policy*

73.     Berklee's Relationships Policy, which applies to "all Berklee employees . . . including but not limited to full- . . . time faculty," prohibits "dating, romantic, or sexual relationships between students, . . . and faculty," including "relationships that occur when Berklee is not in session or students are on leave." *Relationships Policy*, Berklee, https://www.berklee.edu/introduction-table-contents/overview/110-relationships-policy.

74.     The Relationships Policy states that "[f]aculty or staff . . . who violate this policy are subject to corrective action up to and including termination of employment." *Id.*

IV.  **Events Preceding the Alleged Incident Between Ms. Alali and Professor Farzinpour**

75.     Ms. Mina Alali, an undergraduate student at Berklee, enrolled in a course taught by Plaintiff Farzinpour in the Fall 2018 semester.

76.     At some point in the fall of 2018, Ms. Alali sent a "friend" request to Professor Farzinpour on the social media website Facebook. It was ordinary for Berklee students to "friend" their professors on Facebook. Professor Farzinpour did not send "friend" requests to students, but he accepted "friend" requests from students, as did his Berklee faculty colleagues. Facebook was not a website Professor Farzinpour used frequently, and he used it almost exclusively for

advertising his musical activities and learning of other's artistic activities. It was not particularly meaningful to accept a "friend" request from a student or other members of the arts community.

77.     About midway through the Fall 2018 semester, Ms. Alali asked to speak with Professor Farzinpour, and informed him, through tears, that she had to take a leave of absence from Berklee to seek treatment for a personal issue.

78.     Upon seeing Ms. Alali in such distress, Farzinpour told her that her health should be her priority. He proposed that he could give her an "incomplete" in the course and she could finish the course requirements later on — a common accommodation for a student who takes time off for health reasons.

79.     Ms. Alali left Berklee for the remainder of the Fall 2018 semester. Professor Farzinpour completed the semester without knowing what ultimately happened with Ms. Alali.

80.     Plaintiff Farzinpour reached out to Ms. Alali in January 2019 to send his best wishes and to follow up regarding what she wished to do about the "incomplete" notation for his course.

81.     Ms. Alali replied approximately ten (10) days later that she would complete the course during the Spring or Summer 2019 semester, as she was in treatment in Philadelphia, Pennsylvania. She thanked Professor Farzinpour for his understanding and patience and wished him well.

82.     Upon information and belief, Ms. Alali remained on a leave of absence through the Spring 2019 semester. Professor Farzinpour did not have contact with her during that time.

83.     In the Spring 2019 semester, Mr. Nicholas "Nick" Marinelli, Ms. Alali's boyfriend, enrolled as a student in Plaintiff Farzinpour's Conducting 2 course at Berklee. Mr. Marinelli quickly became friendly toward Professor Farzinpour.

84.     As a concerned teacher, Professor Farzinpour inquired about Ms. Alali's health. Mr. Marinelli informed him that Ms. Alali was improving at a treatment program in Pennsylvania. Plaintiff told Mr. Marinelli to send Ms. Alali his best regards.

85.     In the Summer 2019 semester, which began on or around May 28, 2019, Professor Farzinpour taught several courses listed as part of Berklee's Composition Department: two Conducting 1 courses, two Conducting 2 courses, and one Music History course. These courses lasted for approximately twelve (12) weeks.

86.     Just beyond the midway point of the Summer 2019 session, Ms. Alali joined Professor Farzinpour's Conducting 2 course, COND-212-005, which had an enrollment of approximately fifteen (15) students. Professor Farzinpour initially cautioned Ms. Alali that, since the course was already well underway, perhaps it would be best that she re-enroll in the course in a later semester. Nevertheless, the Composition Department Chairperson, Mr. Richard Carrick, permitted Ms. Alali to join the course upon her return from a leave of absence, with approximately five (5) weeks left in the Summer 2019 session.

87.     From the outset of her attendance in the Conducting 2 course, Ms. Alali often stayed after class of her own accord to speak with Professor Farzinpour and to receive additional conducting assistance. Ms. Alali expressed particular interest in learning about Professor Farzinpour's incorporation of yoga, meditation, and mindfulness practices into his conducting and other musical pursuits and asked him about this on multiple occasions. At one point, Professor Farzinpour also asked another student, who was taking his course at the time, and who was also a yoga teacher, to stay after class to advise Ms. Alali about yoga opportunities available in the area. Professor Farzinpour hoped that Ms. Alali's interest in or preference for a fellow student as a

resource might relieve some pressure from the considerable time that Ms. Alali's after-class questions were taking.

88.     As a teacher, Professor Farzinpour met with students outside of class time upon their request to provide mentoring, guidance, and instruction, as schedules allowed, sometimes over coffee, breakfast, lunch, or dinner. All meetings were strictly professional meetings between teacher and students, as is commonplace in the college educational context.

89.     After one particular class, Ms. Alali again stayed afterward and requested a meeting with Professor Farzinpour to discuss yoga and meditation. She followed up her initial verbal request with an email on July 16, 2019, stating, "I'd love to sit down somewhere this week and talk about healing/Bali/meditation, etc.," referring to Professor Farzinpour's meditation practice and his past experience of attending a meditation retreat in Bali, Indonesia. She indicated, "I am free both Wednesday after 5 and Thursday evening. Let me know if this week works for you!"

90.     Responding to this request, Professor Farzinpour agreed to meet with Ms. Alali after class the following week on Wednesday afternoon.

## V.     The Alleged Incident of July 24, 2019

91.     On July 24, 2019, the day of the scheduled meeting, class concluded in the late afternoon. Professor Farzinpour asked Ms. Alali if she still wished to meet to discuss yoga and meditation as she'd requested. She said she did.

92.     Professor Farzinpour asked Ms. Alali if she'd prefer to meet over coffee or pizza. Ms. Alali selected pizza. Having previously been to the bustling market Eataly at the Prudential Center, a five-minute walk from Berklee, several times with male and female students, Professor Farzinpour suggested Eataly and Ms. Alali agreed.

93.     Around 4:00 p.m., Professor Farzinpour and Ms. Alali walked through Belvedere Street and Dalton Street to reach the entrance of the Sheraton Boston Hotel, which provided the closest entrance to the Prudential Center via escalator. On the walk, Professor Farzinpour discussed principles of yoga and mindfulness, the topics Ms. Alali had sought guidance on when requesting the meeting. Consistent with these principles, he gave guidance on her physical posture and implored her to slow her pace and take in the surroundings.

94.     At Eataly, Professor Farzinpour and Ms. Alali ordered food and wine. Professor Farzinpour knew that Ms. Alali was an adult over the legal drinking age, and he would not have permitted any student who was under twenty-one (21) to consume alcohol in his presence.

95.     When Professor Farzinpour engaged in small talk by asking Ms. Alali how she was doing, Ms. Alali unexpectedly brought up her own sexual and body image issues.

96.     Ms. Alali suddenly asked Professor Farzinpour if he brought "all [his] dates to this place." Professor Farzinpour responded in no uncertain terms that this was *NOT* a date. Moreover, he informed Ms. Alali that he had many coffee, breakfast, lunch, and dinner meetings with students, that these were absolutely not dates, and that he had never dated a student, as it would be unethical. Ms. Alali responded to Professor Farzinpour, "You don't have to worry. Nick and I aren't the types to tell on you to anyone." Despite her persistence, Professor Farzinpour repeatedly attempted to change the topic.

97.     Then, Ms. Alali launched into a monologue about the process of recording an album and said she wanted to share her recording with Professor Farzinpour. When he suggested he could listen to it later, Ms. Alali persisted, even asking the waitress if she had a device on which to play the recording.

98.     Professor Farzinpour again said he would listen to it later and sent her a link to his piece "*in memoriam sospeso*" — a somber memorial piece composed by Professor Farzinpour for his performance group ENSEMBLE / PARALLAX.

99.     Ms. Alali then insisted on showing Professor Farzinpour the album cover of her upcoming album, on which Ms. Alali wore a bra-like top, and asked for his opinion. Professor Farzinpour stated that it is her business what she chose to place on her album cover.

100.     To Professor Farzinpour's astonishment, Ms. Alali thrust out her chest and stated that she had "32DDD" size breasts.

101.     Completely taken aback by Ms. Alali's behavior, Professor Farzinpour declined to comment and attempted to pivot the conversation to a non-sexual topic.

102.     Nevertheless, Ms. Alali continued to steer the conversation back towards sexual topics. Plaintiff Farzinpour repeatedly brought up conducting techniques and yoga to try to keep the conversation away from sexual topics.

103.     Ms. Alali asked Professor Farzinpour a question regarding intimate details of his personal life, namely his sexual relationship with his wife. Professor Farzinpour declined to answer.

104.     Ms. Alali and Professor Farzinpour finished eating, and he told her that he had to go. She asked him where he was going, to which he responded that since he had just missed his train to Providence, Rhode Island, he would probably grab a drink while waiting for the next train at the nearby Boston Back Bay Station.

105.     Ms. Alali declared that she wished to wait with him. Professor Farzinpour suggested that she return to whatever matters she needed to attend to, but she insisted on staying with him. Professor Farzinpour felt rude and cold refusing a student - who had just returned from

treatment for major health issues and seemed troubled - permission to wait with him. Feeling awkward in light of her insistence, and empathizing with struggles she might be going through, he assented to her waiting with him.

106.    Professor Farzinpour reluctantly went into Jaho, a restaurant that Ms. Alali suggested. There, they each ordered one dessert martini.

107.    Ms. Alali received several alerts on her phone. Professor Farzinpour asked whether she needed to take a call, hoping that she would need to leave. Ms. Alali replied that the phone alert was a reminder to do something music related but nothing she needed to do at the moment. Professor Farzinpour told her that she should go and complete the tasks rather than stay with him while he awaited his train. Again, Ms. Alali expressed her wish to remain with Professor Farzinpour.

108.    Professor Farzinpour then got up to go board his train. However, due to the slow timing of the check, he missed the train he intended to board. Ms. Alali again insisted on accompanying him to another restaurant, Bar 10, near the train station, while Professor Farzinpour awaited the next train.

109.    Multiple times, Professor Farzinpour strongly suggested that Ms. Alali should go tend to her work, but she insisted on staying with him.

110.    Ms. Alali again attempted to steer the conversation back to a sexual topic. Yet again, Professor Farzinpour attempted to steer the conversation away from the topic.

111.    Professor Farzinpour again brought up the topic of meditation. Ms. Alali proceeded to pivot the conversation again to personal topics, this time informing Professor Farzinpour that she was skilled at impersonations.

112.     Ms. Alali jumped up from the table and began to impersonate a high school teacher, which she did again upon the waiter's return to their table. Professor Farzinpour, unsure of what to do in the moment, politely waited for her to conclude and diverted the conversation back to meditation retreats.

113.     Ms. Alali then returned to the highly sexual line of conversation she had been pursuing earlier, which Professor Farzinpour attempted to turn away from. Again, Ms. Alali asked Professor Farzinpour about his sexual relationship with his wife. Once again, Professor Farzinpour declined to comment.

114.     Ms. Alali asked him if he had ever had a sexual relationship with a student, and Professor Farzinpour responded "No," again reminding her that that would be highly unethical. Ms. Alali revealed that she had had romantic relationships with professors at Berklee's Boston and Valencia campuses in the past.

115.     Feeling very uncomfortable, Professor Farzinpour excused himself to go to the restroom. Shockingly, upon his return to the table, Ms. Alali propositioned Professor Farzinpour, asking him to accompany her to the restroom to engage in sexual intercourse. Professor Farzinpour immediately and unequivocally refused.

116.     Nevertheless, Ms. Alali continued to pursue Professor Farzinpour and suggested he get them a hotel room. Again, he repeatedly declined her requests, saying that would not be happening.

117.     Ms. Alali then brought up another Berklee student who she said was "very sexy" and dressed in a "slutty" manner and asked Professor Farzinpour if he would like to engage in a "threesome" with the two women. He said no.

118.    Professor Farzinpour felt so uncomfortable that he excused himself to go to the restroom once again.

119.    Upon his return, Professor Farzinpour found that Ms. Alali had settled their bill. She stated that she had to leave because her boyfriend had completed his work.

120.    Ms. Alali, who is also of Iranian background, said goodbye in a traditional manner by kissing Professor Farzinpour alternately on the cheeks two times. Once Professor Farzinpour pulled back to embark on his journey home, Ms. Alali, completely of her own accord, pulled Professor Farzinpour back towards her and once again kissed Professor Farzinpour alternately on the cheeks, three times this time, stating that this was how it was meant to be done. Professor Farzinpour pulled back and said that was not traditional Iranian custom.

121.    Ms. Alali and Professor Farzinpour then parted ways. As Ms. Alali walked away, she repeatedly and emphatically stated, "Next week — we're doing this again next week!"

122.    Professor Farzinpour boarded an early-evening train and went home to Providence.

123.    Once Professor Farzinpour returned home, he immediately told his wife of the strange occurrences of the day and his severe discomfort regarding the student's conduct.

124.    Professor Farzinpour's wife urged him to report the student's disturbing conduct to Berklee. However, knowing that Ms. Alali had just returned from a leave of absence and had been in treatment for serious personal health issues, Professor Farzinpour did not want to cause trouble for the student. He wanted to let it go.

125.    The following morning, July 25, 2019, Professor Farzinpour emailed Ms. Alali with three links to yoga retreat search websites, which he had mentioned to her the previous day.

## VI. Ms. Alali's Complaint Against Professor Farzinpour and Resulting Investigation at Berklee

### A. Professor Farzinpour Receives Notice of the Investigation

126.    On July 30, 2019, Professor Farzinpour received frantic phone calls and voice messages from Ms. Kelly Downes, the Chief Equity Officer/Title IX Coordinator of Berklee's Equity Office. Ms. Downes has been described by the President of Berklee College as "a lawyer whose prior work includes prosecuting sex crimes and advising on internal investigations of sexual harassment by police officers." President's Email to Berklee, March 17, 2020.

127.    Professor Farzinpour returned Ms. Downes' phone call immediately upon seeing the messages and missed calls, at which point she informed him that there had been an equity complaint filed against him. As a result, he would have to meet with Ms. Downes and be interviewed by the investigator, Ms. Jaclyn Calovine.

128.    Without any opportunity to see the complaint, to know what the allegations were and who was accusing him, or to present his view of the alleged events, Professor Farzinpour was told, in his phone call with Ms. Downes, that he had been placed on paid administrative leave, effective immediately, and that he would not be permitted to teach any further classes until the matter was resolved.

129.    Professor Farzinpour told Ms. Downes that he would fully cooperate with the investigation and that he wanted to clear everything up as quickly as possible so that he could resume teaching his classes.

130.    After the phone conversation, Ms. Downes sent Professor Farzinpour the Notice of Investigation Letter dated July 30, 2019 ("Notice"), which stated that Mina Alali accused him of violating two Berklee policies: the Sexual Harassment Policy and the Relationships Policy.

131.    Regarding the sexual harassment claim, the Notice specified that Ms. Alali alleged that Professor Farzinpour made "numerous unwelcome sexual advances toward the reporting party by engaging in the following behavior: commenting on her physical appearance, for example, her breasts and body shape; expressing a sexual attraction towards her; and suggesting that they engage in sexual activity."

132.    Regarding the Relationships Policy claim, Ms. Alali alleged that Professor Farzinpour "violated Berklee's relationships policy by participating in a date or attempting to engage in a dating or sexual relationship with a student."

133.    The Notice stated that Ms. Downes had appointed Ms. Jaclyn Calovine, the Deputy for Equity Investigations, as the sole investigator for the matter, and that Ms. Calovine would meet with Professor Farzinpour "to discuss the allegations made against you and provide you with an opportunity to respond." It informed him that he had a "right to submit information or documentary evidence and to identify witnesses who may have relevant information."

134.    While claiming that Berklee "is committed to a fair and thorough investigation," the Notice stated again what Ms. Downes had told Professor Farzinpour before she gave him the complaint and notified him of the nature of the allegations: that based simply on the complaint of sexual harassment being filed, Berklee had already placed Professor Farzinpour on administrative leave — without any notice, inquiry, or opportunity to be heard.

135.    The Notice further stated that "Berklee strictly prohibits any and all retaliation against any party or witness in an equity process. Retaliation is any conduct or behavior that interferes with a person's rights and ability to pursue internal disciplinary processes as well as access to education and/or work."

27

136.    The Notice stated, "[r]etaliation against a reporting party or witness may violate Berklee policy and the law even if the original complaint of misconduct cannot be substantiated." While it specifically mentioned protection from retaliation against a complainant, the Notice did not mention protection from retaliation against a respondent in an investigation.

137.    The Notice prohibited contact between Ms. Alali and Professor Farzinpour.

138.    The Notice also stated, "[w]hile on leave, you should refrain from participating in any Berklee activities, whether on or off campus." Berklee shut down Professor Farzinpour's access to all of his Berklee accounts, including his email, his class schedules and rosters, and his paycheck and tax information. The Notice stated that he was "not expected to communicate with any community members." As a result of being cut off from access to his emails and class information, Professor Farzinpour was unable to review evidence that would have been in his possession, gather potentially exculpatory evidence, and prepare for the meeting or interview.

139.    Ms. Downes put Professor Farzinpour in contact with the assigned Investigator, Ms. Calovine, to set up the first meeting and interview. Professor Farzinpour contacted former union head, Mr. Jackson Schultz, to ask that he accompany Professor Farzinpour to any meetings or interviews.

B.    *Professor Farzinpour Is Interviewed for the First Time*

140.    On August 5, 2019, Professor Farzinpour — accompanied by his wife and now-retired Berklee Faculty Union President, Mr. Schultz — met with Ms. Downes.

141.    Ms. Downes detailed the disciplinary process and stated that Professor Farzinpour would have an opportunity to ask questions and raise concerns. Additionally, Ms. Downes assured Professor Farzinpour that the investigation process would be fair, equitable, and balanced. She told him that he could also request an investigation of Ms. Alali, should he wish.

28

142.     Professor Farzinpour expressed his intent to fully cooperate with the investigation, as he was certain that he would be cleared of these false allegations. He expressed his desire to proceed expeditiously through the investigation, so that he could provide the final remaining weeks of instruction to his students and complete the semester.

143.     At the August 5 meeting, both Ms. Downes and Ms. Calovine assured Professor Farzinpour that he might possibly be able to return to teaching before the semester ended. But Professor Farzinpour later discovered (from students who reached out with concern for him) that the substitute teachers had informed the students in his classes, around the same time as his first interview, that he would not be returning for the remainder of the semester.

144.     Following Professor Farzinpour's meeting with Ms. Downes, he met with Ms. Calovine, the Investigator, for approximately four hours. Although the meeting was initially scheduled for only two hours, Professor Farzinpour wanted to be as transparent, open, and detailed as possible about the events that transpired. Throughout the meeting, Professor Farzinpour consistently asserted and underscored his innocence.

145.     Professor Farzinpour's wife, who accompanied him, volunteered to be interviewed on that same day. However, Ms. Calovine declined to interview her, and said that she would let Professor Farzinpour know whether she deemed it necessary for his wife to be interviewed.

146.     During the interview of Professor Farzinpour, Ms. Calovine displayed behavior that indicated her bias against Professor Farzinpour. For instance, when Plaintiff Farzinpour stated that it was unremarkable for him to have meetings with students over coffee or meals, Ms. Calovine made a very surprised and disapproving facial expression — as if to reveal her view that such a meeting would always be inappropriate between a male professor and a female student.

147.    Furthermore, when Professor Farzinpour expressed that any meetings he had with students that occurred outside of normal class time or office hours took place in public places that likely had security cameras, Ms. Calovine expressed her assumption that he had some nefarious underlying intent, asking, "You mean you planned this so there would be cameras around? You plan your meetings with students knowing in advance there are cameras around?" Professor Farzinpour replied that as a general practice he met with students in public places rather than private ones, and that public places often had security cameras.

148.    Professor Farzinpour requested that Berklee obtain security camera footage to corroborate his version of the events. Ms. Calovine stated that Berklee was not interested in video surveillance footage and would not go through the trouble of obtaining it.

149.    Ms. Calovine repeatedly pressed Professor Farzinpour as to why he had not removed Ms. Alali from his Facebook friends immediately after the day of the incident in question. Professor Farzinpour replied that he uses Facebook primarily to promote his performances, and does not use it much beyond that professional purpose.

150.    Ms. Calovine pressed Professor Farzinpour as to why Ms. Alali had accompanied him to several places over several hours on the day of the incident in question. Professor Farzinpour replied that he urged Ms. Alali a number of times that she should leave, but that Ms. Alali insisted on remaining, despite his unwavering requests for her to leave. In spite of Professor Farzinpour's visible discomfort with the overtly sexual nature of Ms. Alali's suggestions and actions, Ms. Alali adamantly expressed her desire to stay with Professor Farzinpour and continue their conversation.

151. Professor Farzinpour asked Ms. Calovine to consider why Ms. Alali would have opted to stay with him if his behavior had allegedly been so egregious as to warrant a complaint or if she had felt uncomfortable. Ms. Calovine did not respond.

152. Professor Farzinpour suggested that many students he met with, both in and outside of the classroom, would testify that he had never behaved in such manner as Ms. Alali alleged. However, Ms. Calovine dismissed this statement, declining to pursue character witnesses.

153. Nonetheless, on September 30, 2019, several female students at Berklee went to the Equity Office of their own accord to speak in support of Professor Farzinpour and attest to his integrity. However, their supportive statements were not taken into account because they were considered character testimony. The Equity Office refused to share the statements with Professor Farzinpour when he requested them after the end of the investigation.

154. Near the conclusion of the meeting, Professor Farzinpour expressed his concern that Berklee's Equity Office had demonstrated inequity toward men with respect to disciplinary investigations. Specifically, Professor Farzinpour mentioned that the Equity Office distributed literature and associated promotional products that are one-sided in support of women. Ms. Calovine assured Professor Farzinpour that the office would be "absolutely impartial."

155. Throughout the meetings with both Ms. Downes and Ms. Calovine, Professor Farzinpour strongly maintained his innocence.

C. *Berklee Denies Plaintiff Farzinpour's Request to File a Complaint Against Ms. Alali*

156. Based on Ms. Downes having informed Professor Farzinpour at his first interview that he could file a complaint and request an investigation of Ms. Alali if he wished, on August 6, 2019, he requested to file a Title IX sexual harassment complaint against Ms. Alali.

31

157.    Ms. Downes replied that, "My suggestion is that you first raise this issue in the context of your discussions with" the Investigator, "and she may address your claim as part of her investigation as appropriate."

158.    On August 8, 2019 Professor Farzinpour emailed the Investigator and Ms. Downes that he was reporting "repeated incidents of sexual harassment and aggression by a Berklee student against me on July 24, 2019." He reported: "The student asked me to go out with her under the guise of discussing holistic, wellness retreats (yoga/meditation) and my experiences at such retreats in Bali. However, once we went to discuss these subjects, she repeatedly made very inappropriate, sexually suggestive comments to me and asked me very inappropriate sexual questions." He reported that "she propositioned me to have sex with her in the bathroom of the Bar 10 establishment and after I emphatically refused this (repeated) proposition, she repeatedly demanded that I get a hotel room to engage in sexual activity with her." Professor Farzinpour requested that Berklee put in place supportive measures for him while the investigation was carried out. He followed up on this report on August 10, 2019.

159.    On August 15, 2019, Ms. Downes replied that she was "deciding not to issue a complaint at this time," that she was exercising her "discretion as Chief Equity Officer/Title IX Coordinator to determine whether the complaint rises to a policy violation," and that it was "appropriate to give special care to the complaint to ensure that it is not retaliatory in nature." She promised that once the Investigator had "gathered more details," she would "reassess whether to issue a complaint."

160.    Professor Farzinpour repeatedly reiterated that he would like to move forward with a complaint, as he did believe that her conduct fit the definition of sexual harassment and warranted a complaint and investigation.

161.    Berklee never agreed to issue a complaint.

D. *Berklee's Equity Office Fails to Act in Response to Retaliation Against Professor Farzinpour*

162.    In August 2019, while the investigation was ongoing, the Equity Office received notification from several Berklee students that Ms. Alali was spreading false statements about Professor Farzinpour regarding the alleged incident that was the subject of her complaint and that had resulted in the imposition of his administrative leave pending resolution of the matter.

163.    Specifically, students told the Equity Office that Ms. Alali approached a sizable group of approximately a dozen Berklee students whom she did not know at Earls Kitchen + Bar, and falsely boasted that she had gotten Professor Farzinpour fired for sexually harassing her.

164.    The students said that Ms. Alali approached the group of students, asked if they all went to Berklee, and told them that she had "tea to spill," meaning gossip, about Peyman Farzinpour.

165.    Then, Ms. Alali proceeded to share with the large group, a false and graphic story of the alleged incident, tarnishing Professor Farzinpour's name and reputation.

166.    Two Berklee students who were present were so upset about Ms. Alali's conduct that they reported the incident to the Equity Office, in August 2019.

167.    Out of concern for his reputation, Ms. Alali's violation of confidentiality, and her violation of the retaliation policy during an ongoing investigation, Professor Farzinpour emailed and left a voice message for Ms. Downes about the false statements by Ms. Alali spreading among Berklee students.

168.    However, Ms. Downes never returned his phone call or responded to his email regarding this issue.

E. *Plaintiff Farzinpour's Second Interview with Ms. Calovine*

169.    On August 30, 2019, Professor Farzinpour appeared for a second interview with Ms. Calovine, via web conference, accompanied by his advisor and sister, attorney Ms. Shiva Farzinpour.

170.    During this interview, Ms. Calovine reviewed the dates and chronology of events, which remained consistent with Professor Farzinpour's prior account. Ms. Calovine continuously pressed him for confirmation of times and dates, despite her knowledge that Professor Farzinpour did not then have access to this information as a result of his exclusion from his Berklee email account.

171.    In response to Professor Farzinpour's request for access to his emails for the purposes of identifying evidence with which to defend himself, Ms. Downes had told him that he could review his emails by going to Berklee and viewing them "with a staff member present." However, Professor Farzinpour was staying in Los Angeles for his administrative leave. Ms. Downes also said that he could tell a staff member which emails he wanted, but Professor Farzinpour did not recall precisely which emails he had, which was why he needed access to search them for relevant information. The upshot was that due to Berklee's decision to shut him out of his accounts upon receiving a sexual assault complaint, he could not access information with which to defend himself against that complaint.

172.    Ms. Calovine noted that Ms. Downes had asked Professor Farzinpour whether he wished to file a complaint against Ms. Alali. Professor Farzinpour replied that he did indeed request to file a complaint, and Ms. Downes denied him the opportunity to do so.

173.    During the interview, Ms. Calovine asked Professor Farzinpour whether he remembered a class period wherein Ms. Alali and another student exchanged vulgarities in several

34

foreign languages, to which Plaintiff Farzinpour replied that he did not recall such an occurrence. Ms. Calovine explained that, in class, Ms. Alali allegedly uttered a Spanish phrase meaning "I need dick." According to Ms. Alali, Professor Farzinpour, not understanding Spanish, did not know she had said something vulgar or sexual, and asked her what it meant. When she translated, he allegedly replied, in class, that she'd have to take that up with her boyfriend.

174.   Professor Farzinpour told Ms. Calovine that he had no recollection of such an exchange. Ms. Farzinpour noted that if Ms. Alali had indeed made the statement she claimed to have made, then that would constitute sexual harassment of Professor Farzinpour by Ms. Alali. Ms. Calovine became silent on this point and moved forward with other questions.

175.   Ms. Calovine asked if Professor Farzinpour recalled whether Ms. Alali's boyfriend, Mr. Marinelli, told Professor Farzinpour that Ms. Alali had attempted suicide. Professor Farzinpour was shocked because he had not previously known about this, and stated that Mr. Marinelli had never informed him of that tragic occurrence.

176.   Ms. Calovine asked Professor Farzinpour if he recalled Mr. Marinelli telling him that Ms. Alali had a problem with alcohol abuse. Once again, Professor Farzinpour was shocked and responded that he knew nothing of the sort and that had he known, he would never have met with Ms. Alali at any establishment that served alcohol. (The personal issue for which Ms. Alali had informed him she was in treatment was not alcohol or substance abuse.)

177.   When Professor Farzinpour asked Ms. Calovine whether any evidence submitted to date refuted his account of the events, Ms. Calovine replied in the negative.

178.   Ms. Calovine informed Professor Farzinpour that she had completed witness interviews, which included: three interviews with Ms. Alali, two interviews with Professor

Farzinpour, and one interview with Mr. Marinelli, Ms. Alali's boyfriend. Notably absent from Ms. Calovine's witness interview list was Professor Farzinpour's wife.

179.    Ms. Calovine did not inform Professor Farzinpour that two additional witness statements had been taken by the Equity Office, from one current and one former student of Professor Farzinpour. Both witness statements testified that Ms. Alali had eagerly boasted about her complaint against Professor Farzinpour, stating that she was the "reason he got fired."

180.    When Professor Farzinpour and his advisor pointed out that the investigation process had not been fair and unbiased, as previously promised, Ms. Calovine responded that the investigation was being conducted **"through the lens of the student,"** Ms. Alali, the complainant or reporting party.

181.    Conducting an investigation "through the lens of the student" was inconsistent with the Policy, which promises that the investigation will be "thorough, impartial, and fair." It was also inconsistent with Ms. Calovine's promise at their initial meeting that the investigation would be "absolutely impartial."

182.    Toward the conclusion of the second interview, Professor Farzinpour's advisor asked what would happen if Professor Farzinpour did decide to move forward with a complaint about Ms. Alali's conduct. Ms. Calovine replied that Ms. Alali had completed her coursework on campus and was no longer on campus, falsely implying that there was nothing that Berklee could do to investigate a sexual harassment complaint in that situation. (In fact, Ms. Alali did not graduate from Berklee until May 2020.)

183.    Professor Farzinpour's administrative leave continued throughout the Fall 2019 semester, as he awaited a decision.

F. *Berklee Declines to Interview Professor Farzinpour's Corroborating Witness*

184.    Professor Farzinpour identified his wife as a witness to Ms. Calovine and Ms. Downes on several occasions, including at the first interview, on August 5, 2019. Ms. Calovine responded that she would let Professor Farzinpour know if an interview with his wife was needed.

185.    Despite Professor Farzinpour's repeated requests, Ms. Calovine did not interview his wife.

G. *Berklee Reacts Harshly to Farzinpour's Use of Campus Rehearsal Rooms and Denies Him the Opportunity to Apply for Grants.*

186.    The July 30, 2019 Notice of Investigation Letter stated, "While on leave, you should refrain from participating in any Berklee activities, whether on or off campus."

187.    Professor Farzinpour did "refrain from participating in any Berklee activities" during his administrative leave. For example, he refrained from attending an event on Berklee Teachers on Teaching, weekly departmental meetings, and office hours – all of which are normally paid activities for faculty members. He also refrained from attending or participating in Berklee concerts and departmental seminars.

188.    Professor Farzinpour did not, however, think the Notice meant that he was banned from ever being physically on campus during his leave, just that he should refrain from participating in Berklee activities.

189.    Professor Farzinpour asked Ms. Downes about his continuing work with Berklee colleagues, and she said she understood about his continuing his professional activities.

190.    After obtaining Ms. Downes' clarification, Professor Farzinpour returned to the Berklee campus on three evenings to rehearse music with a Berklee colleague and other music professionals, which did not constitute "Berklee activities."

191.    After those three evenings, Berklee reacted by notifying Professor Farzinpour that he would be arrested and charged if he set foot on the campus again during his administrative leave.

192.    Professor Farzinpour attempted to explain to Ms. Downes that his honest and reasonable misunderstanding of Berklee's intentions in the Notice derived from ambiguity in its language, but she did not respond. Berklee kept the ban from campus and threat of arrest in place.

193.    Professor Farzinpour did not go to campus again during his administrative leave after receiving Berklee's threat of arrest, with one exception, on January 14, to meet with his division dean, Matthew Nicholl, a meeting which had been coordinated in advance, with permission given to him to be at Berklee.

194.    During the Fall 2019 semester, Professor Farzinpour expressed a wish to apply for the Newbury Comics Award, the highest monetary award that Berklee offers. This was a particularly important opportunity for Professor Farzinpour, as it was a very prestigious and high-value grant.

195.    Berklee denied Professor Farzinpour the opportunity to apply for this grant and other awards, because of the involuntary administrative leave. Notably, he had been a finalist for the Newbury Comics Award the previous year, and he had been told by the Director of Faculty Development that his application had tied for first place and was narrowly beaten by the eventual winner. The Director of Faculty Development had further indicated that Professor Farzinpour had submitted a very strong application and had a substantially high likelihood of winning the award the following year (2019–2020).

H. *Berklee Imposes Unreasonable Conditions on Viewing Investigation Materials*

196.     On October 16, 2019, Ms. Calovine informed Professor Farzinpour that the investigation materials had been made available to Ms. Alali and that she had submitted a response. Berklee notified Professor Farzinpour that he could view the materials, but only upon signing a waiver, which stipulated as follows:

> I understand I am not permitted to save, copy, print, photograph, or otherwise preserve or reproduce the documents provided.

> I understand I am not permitted to send, forward, or otherwise share the documents with anyone.

> I understand I am not permitted to take any retaliatory action against any witnesses who have provided information to the Investigator or anyone else involved in the process.

> I understand that I am permitted to take notes during the Investigative File Review.

197.     Because the Policy promised that he would "be given the opportunity to review a summary of relevant evidence" and to "submit any comments about this summary," Professor Farzinpour was not willing to waive his rights, specifically his right to share the investigative materials with his advisor, his attorney, and his wife. He also could not in good faith promise not to "send, forward, or otherwise share the documents with" his attorney in order to pursue enforcement of his legal right to fair, impartial, and unbiased process, and to prepare for possible legal action if needed. Professor Farzinpour also did not see how he could obtain advice of counsel for this purpose if he could not "save, copy, print, photograph, or otherwise preserve or reproduce the documents" from the investigation. Because he refused to sign the waiver that Berklee imposed as a condition of receiving access to the evidence gathered in the investigation, Berklee refused to give Professor Farzinpour access to the evidence. Professor Farzinpour was therefore unable to respond to the evidence before Berklee proceeded to a finding of responsibility.

I.   *Berklee Completes the Final Report More than Four Months After Initial Complaint*

198.     Professor Farzinpour was kept in the dark for months without updates regarding the status of the investigation and final outcome. He learned that during the Fall of 2019, his Dean had reached out to the Equity Office every few weeks to find out the status of the investigation and whether Professor Farzinpour would be returning to teach classes in the Spring semester.

199.     Ms. Calovine finally notified Professor Farzinpour of the outcome of the investigation and issued a final report of investigation on December 13, 2019, more than four months after the complaint was filed, and only after Professor Farzinpour retained an attorney to press Berklee on its delayed proceeding.

200.     Only after Berklee announced its decision to find Professor Farzinpour responsible for sexual harassment and to suspend him, was he given access to the evidence gathered in the investigation for the first time — evidence to which he was not afforded the opportunity to respond prior to Berklee's determination of responsibility.

201.     The evidence included an audio recording (the "Recording") created by Ms. Alali and her boyfriend, Mr. Marinelli, immediately after the alleged incident on July 24, 2019. In the Recording, Ms. Alali told Mr. Marinelli: "And I have to say that when he asked me to go to Eataly, I was like, I'm getting myself into some — something"; "And of course like, I actually took what you said into — I was like, looking at his hand, I was seeing like, did he drop anything in the drink?" (Ms. Alali acknowledged in the Recording that he had not drugged her drink.) Such statements indicated her imagination of things that simply were not there.

202.     In the Recording, Ms. Alali falsely recounted several conversations that simply did not take place. Additionally, she falsely attributed to Professor Farzinpour statements of a sexual

nature that she herself had made to him, routinely reversing and flipping their roles in the conversation that had occurred and that had made Professor Farzinpour severely uncomfortable.

203.    Ms. Alali also said in the Recording, "I have to tell you, the whole fucking time, I'm being such a good actor." She explained repeatedly to her boyfriend that she "was testing him the whole time," "I wanted to dig. I wanted to see like, what he wanted," and "I wanted to test, and see how far he went." Ms. Alali's boyfriend asked her on the Recording, "I can see why he would feel that you're insinuating something that's beyond testing him, you get what I'm saying?"

*J.    Berklee Erroneously Finds Farzinpour Responsible and Imposes Sanction*

204.    Berklee erroneously found Professor Farzinpour responsible for sexual harassment and imposed a sanction that included: (i) an unpaid suspension of thirty days, (ii) mandatory training, (iii) a ban on private off-campus meetings with students, (iv) a permanent ban on use of Berklee facilities "for purposes that are not directly related to [Farzinpour's] teaching responsibilities," (v) ineligibility for non-contractual work and Berklee's Summer Sessions, and (vi) a final written warning.

205.    Berklee's imposition of a permanent ban on using Berklee facilities for rehearsals not related to teaching responsibilities was extraordinarily harsh, given that faculty members rely on Berklee rehearsal space for musical pursuits that are important to their professional careers as musicians.

206.    Berklee justified that harsh sanction with reference the fact that Professor Farzinpour used Berklee rehearsal space several times during his administrative leave, before he was threatened with arrest, even though he explained that he had honestly and reasonably understood the Notice's language, "you should refrain from participating in any Berklee activities,

whether on or off campus," to mean that he could be on campus as long as he was not participating in "Berklee activities."

207.    The final written warning in the outcome letter stated: "In summary, we require that you consistently conduct yourself in a manner that upholds the values of the institution and profession: values of respect and modeling appropriate conduct and interactions both in and outside the classroom. . . . Please understand that any further violations of Berklee policy or standards of conduct, or willful disregard for expectations . . . will result in the termination of your employment."

208.    Professor Farzinpour was not found responsible for a violation of the Relationships Policy.

**VII.    Berklee Denies Professor Farzinpour's Appeal**

209.    Professor Farzinpour submitted his timely appeal of the findings on January 7, 2020, based on the following grounds: (i) the investigation process was not adhered to and such non-adherence may have had a material impact on the outcome of the matter under investigation, and (ii) the sanctions assigned were disproportionate to the alleged violation or to the sanctions issued to others who have been found responsible for substantially similar violations.

210.    On January 17, 2020, Berklee notified Professor Farzinpour that his appeal met sufficient grounds for review, and that it would assemble an appeal panel accordingly.

211.    Ms. Downes appointed the following individuals to the appeal panel: (i) Michelle Quinones, Director of Community Standards and Conflict Resolution and Deputy for Student Appeals, (ii) S. Jay Kennedy, Vice President for Academic Affairs/Vice Provost, and (iii) Kimberly Haack, Chief of Staff, Boston Conservatory at Berklee.

212.    In the Appeal Outcome Letter of February 5, 2020, Berklee denied Professor Farzinpour's appeal and upheld the finding of responsibility and all sanctions.

## VIII.   Professor Farzinpour Files a Grievance Claim

213.    On February 20, 2020, Professor Farzinpour filed a Step 3 grievance claim with Larry Simpson, Provost/Senior Vice President for Academic Affairs, pursuant to Article 11 of the Grievance Procedures of Local 4412, the Berklee Teacher's Union.

214.    On May 11, 2020, Professor Farzinpour was notified that his grievance claim had been denied on May 8, 2020, without any explanation.

## IX.   Professor Farzinpour's Return to Berklee and Ensuing Publicity

215.    Professor Farzinpour completed his suspension of thirty days and resumed his teaching at Berklee on Thursday, February 20, 2020, several weeks into the Spring semester.

216.    In Fall 2019, Professor Farzinpour had requested a discussion with his departmental chair, Mr. Carrick, to discuss the Spring and Summer semester teaching schedules, in anticipation of his reinstatement. However, he was not afforded this opportunity. As a result, when he was reinstated in Spring 2020, he was given fewer classes than his normal full course load, which resulted in a reduction of pay.

217.    Shortly after his return to teaching, on March 1, 2020, Ms. Alali posted a lengthy public message on both Facebook and Instagram, which included false statements about Professor Farzinpour:

> I will not keep silent anymore about something that has been such a heavy burden for me to keep to myself for over half a year now.
>
> A professor of mine at Berklee whom I loved, trusted, and respected, sexually harassed me last summer 2019. What was supposed to be a coffee outing to discuss mental health, mindfulness, and meditation, turned into a date-like outing where he explicitly expressed his sexual attraction to me, claimed that I sexualize myself through my

43

clothing choices to make up for body insecurities (including my clothing/style that day — a black tank top, gray gym shorts, a skateboard — picture attached was taken 3 hours before the outing), said that although he could be fired for saying this, he thought I was "hella hot and sexy," asked me why do I think some of his female students attend his class in "daisy-duke shorts and low cut shirts" if they know he'll be there, and lastly attempted to use the concept of polyamory to justify why following him to the bathroom of a bar would be okay — though he had a wife and I had a boyfriend.

The reason why I am choosing to share my story, is because after a LENGTHY investigation with my school's Equity Office where he was found "responsible for violating Berklee's Equity Policy", he has been permitted to return and teach classes as normal, with none of this information given out publicly to the student body and Berklee Community. This is abominable, shameful, and completely reflective of a deeply-rooted systemic issue.

On February 4th, 2020, coincidentally the day that I learned my appeal was dismissed and this professor would be able to return to campus in less than one month, Berklee's President, Roger Brown, sent out an email in response to, "The Atlantic Story on Sexual Harassment," which was yet another case in which a Berklee student was involved in a sexual harassment case with a professor. Just like the posters we see on every corner, and in every Berklee bathroom, Roger Brown echoed, "If you witness or hear of unacceptable behavior, please contact the Center for Diversity, Equity, and Inclusion or Human Resources to learn more about support resources and reporting options." Well, I did. My harasser has been given his light sanctions — his slap on the wrist — and is now back teaching.

Just two short years ago following the Boston Globe article and backlash from the Berklee community regarding the lack of proper handling of sexual harassment and assault cases, Roger Brown shared these words during the forum at the Berklee Performance Center: "We are not going to tolerate it," he said. "[...] And behind every one of those issues is at least one — in many cases, multiple students — whose dream was shattered," he said. "Whose expectations of us were destroyed, and who lost trust in us and maybe in themselves. [...] Today's dialogue affirms our ongoing commitment to eradicating abuse and harassment," he said. "It is an important step in listening to students, setting a path forward together and holding each other accountable.

> To Roger Brown and the Berklee Equity Office: this is not "zero tolerance," as you assure the Berklee community. If a professor who's been found to have violated the rules on sexual harassment is back in the classroom, that puts every student who signs up for his class at risk of having to endure his behavior. Therefore, this cannot possibly be zero tolerance, if it's okay to put students at risk. This is, "being permissive of professors who shamelessly sexualize their students."

> This incident occurred during my last on-campus semester at my dream school. Before this, I spoke highly of Berklee and felt forever appreciative for what the school gave me. I do not want this horrendous, traumatizing event to taint my Berklee experience for the rest of my life. What we need is a dramatic change in the system, and more specifically a change in the process of assigning proper sanctions for professors found guilty of sexual harassment and assault. I, and I'm sure all my fellow students, want to see the prioritization of students' safety, and their physical, emotional, and mental well being. Do something.

218. The following day, on March 2, 2020, Mr. Marinelli, Ms. Alali's boyfriend, revealed information about Berklee's confidential investigation on social media, explicitly using Professor Farzinpour's name, thus destroying any confidentiality that remained:

> Peyman Farzinpour was found guilty of sexually harassing a student. No sanctions against him were lifted or lightened. He was never exonerated or found "innocent" of anything.

> I will not be giving details beyond this, but some of the comments on the last post that I saw regarding this situation left a pretty fucking bad taste in my mouth and y'all deserve to know the truth. Too much of this shit has been going on for this to be taken so lightly.

219. A few days after these acts of retaliation by Ms. Alali and Mr. Marinelli, printed signs listing several male Berklee professors' names, including that of Professor Farzinpour, were plastered around the Berklee campus and on various streets throughout Back Bay, with the following text at the bottom: "We will not be silenced." The posters clearly implied that the male professors who were named were sexual predators. Berklee ultimately removed these signs from its campus, only after the undersigned counsel requested that Berklee do so. Professor Farzinpour's

attorney requested surveillance footage of the areas of campus where the posters had been placed, but Berklee refused to share this footage with Professor Farzinpour and his counsel.

220.     The *Boston Globe* then published an article on March 16, 2020 about sexual harassment allegations against several male professors at Berklee College, including Professor Farzinpour. *See* Diti Kohli, *Sexual Harassment Allegations Against Professors Set off Social Media Frenzy at Berklee College of Music*, Bos. Globe (Mar. 16, 2020, 4:42 PM), https://www.bostonglobe.com/2020/03/16/metro/sexual-harassment-allegations-against-professors-set-off-social-media-frenzy-berklee-college-music.   The article named Ms. Alali, highlighting her public social media post, and named Professor Farzinpour.

221.     On March 16, 2020, Ms. Alali posted the *Boston Globe* article, which identified Professor Farzinpour by name, on Facebook, with a call to action:

> I know there's a lot going on, but it would mean a lot to me and the rest of the Berklee community if people took the time to read and share this, because it's a huge issue that needs to be resolved ASAP.
>
> Thank you to the Boston Globe and Diti Kohli for bringing massive light to this horrific issue. And thank you to my fellow peers for speaking out, for the support, and for continuing this conversation, because something clearly needs to change.
>
> 'I feel empowered, and hopeless at the same time.' Berklee — DO SOMETHING.

Ms. Alali posted a similar message on Instagram on the same day. She also mentioned the article and directed her followers to read it in an Instagram post on May 7, 2020, and included a link to the article in the "bio" on her Instagram profile from March 16, 2020 until approximately May 11, 2020.

222.     On March 17, 2020, Roger Brown, the President of Berklee College, sent an email alerting the entire Berklee community, "Yesterday, the *Boston Globe* published a story about

recent social media posts by Berklee students. In these posts, students shared strong feelings about experiences they described having with some Berklee faculty members." President's Email to Berklee, March 17, 2020.

223.    President Brown continued: "I want to reaffirm my unwavering commitment to eliminating harassment and misconduct from our campus, and apologize to anyone who has experienced mistreatment at Berklee. The behaviors that cause us to take action against faculty are abhorrent, and we will continue to do everything within our power to eliminate these behaviors from our community." *Id.*

224.    President Brown continued: "Students, we know you are frustrated. . . . Reports to our Equity Team—and their subsequent investigations into allegations—allow us to take action." *Id.*

225.    President Brown wrote that "social media has an important role in illuminating the experience of survivors," while acknowledging that "we cannot impose a sanction based solely on a social media post" and that "in order to terminate or otherwise sanction a faculty member," there must be "a thorough investigation using our equity process." *Id.*

226.    President Brown defended Berklee's "strong track record of taking decisive action," and opined that "true change will happen only when we all take responsibility for changing behavior and continue to administer serious consequences to those who refuse to comply with our values and our standards." He noted "how much work is yet to be done" to "root out abusive behavior," and that at Berklee, "doing the work exposes the ugly and reprehensible." *Id.*

### X.    Berklee Terminates Professor Farzinpour's Employment

227.    As a result of Ms. Alali's public Facebook social media postings about Professor Farzinpour, Mr. Marinelli's Facebook post naming Professor Farzinpour, and the posters around

Berklee listing his name, Professor Farzinpour's students came to his class and urgently questioned him publicly during class time. The students asked him about the allegations, the investigation, his sanction, and his administrative leave. Confronted by students demanding questions, Professor Farzinpour believed that he could not preserve his ability to teach them with any effectiveness if he did not answer their questions, provide explanations, and respectfully address their concerns as their teacher. Assuring his students that they were not in the company of a sexual predator, he defended himself, explaining that Berklee's finding of responsibility, which had become public in Ms. Alali's and Mr. Marinelli's social media posts, was erroneous, and that the Berklee process had been unfair. His students reacted in an overwhelmingly supportive manner.

228.    Then, on March 30, 2020, Mr. Carrick, the department chair, emailed Professor Farzinpour to express "surprise and disappointment" upon learning that Professor Farzinpour may have discussed the matter in class rather than "sticking to the curriculum."

229.    Professor Farzinpour replied that he had fully covered the curriculum, but also had felt obligated to answer students' questions, given their concerns over the public reporting about him. He expressed disappointment at Mr. Carrick as his departmental chair for not having done more to protect his faculty member from false reports and retaliatory action, and expressed surprise, given President Brown's email to the entire community about the Boston Globe article, at any expectation for him to remain silent rather than defend himself against defamatory and damaging public statements.

230.    On April 2, 2020, without any notice, opportunity to be heard, inquiry, investigation, or any process whatsoever, Professor Farzinpour was informed by Mr. Carrick that Berklee was terminating his employment.

231.    Upon his termination, and without warning, Berklee disabled Professor Farzinpour's password for his Berklee issued laptop computer that Berklee supplied to every professor. Berklee denied Professor Farzinpour's request to be allowed brief access to the laptop, supervised by Berklee staff, for the limited purpose of retrieving his files. Professor Farzinpour therefore had to return the laptop to Berklee without being able to keep any of his files, including important and extensive musical work that he had done and saved on the laptop. That work is now lost.

### XI.    Professor Farzinpour's Injuries

232.    Professor Farzinpour has suffered and will continue to suffer significant damages as a result of Berklee's erroneous finding of responsibility, thirty-day suspension, and wrongful termination of his employment.

233.    As a result of Berklee's biased and flawed investigation, and resulting erroneous decisions to suspend and then terminate him, Professor Farzinpour suffers from severe depression and anxiety. He has regularly seen a psychiatrist, who raised the levels of his medications and prescribed additional medications.

234.    Professor Farzinpour's suffering was so severe and apparent to his family that they encouraged him to receive ketamine treatments. Professor Farzinpour received numerous ketamine treatments in Los Angeles and New York, to aid in lessening his extremely severe depression, anxiety, and migraines.

235.    Due to his severe depression, anxiety, and migraines, he has been unable to fully perform his duties for ENSEMBLE / PARALLAX, despite the important and rigorous schedule of events.

236.     By being barred from faculty events and meetings, Professor Farzinpour, who received hourly compensation from Berklee, suffered a loss of wages because he would have been compensated for attending such events.

237.     As part of the sanction, Berklee barred Professor Farzinpour from teaching summer courses, resulting in additional lost wages.

238.     By being unfairly barred from the Berklee campus for over an entire semester, Professor Farzinpour could not recruit, advertise, or rehearse for ENSEMBLE / PARALLAX in the manner he has done in the past. As a result, Professor Farzinpour incurred unexpected expenses for rehearsal space and talent, and suffered lower attendance rates at performances.

239.     As a further result of Berklee's and Ms. Alali's actions, his employment with the Rivers Symphony Orchestra was also terminated, in or around March of 2020.

240.     Finally, because of his wrongful termination from Berklee, Professor Farzinpour suffered loss of income on which he depended for his livelihood.

## COUNT I
## Violation of Title IX

241.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

242.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

243.     Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Berklee College of Music.

244.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979).

245.    Title IX requires schools to adopt grievance procedures providing for prompt and equitable resolution of sexual misconduct complaints. 34 C.F.R. § 106.8(b).

246.    Title IX requires that the grievance procedures adopted by a school such as Berklee must accord a fair process to all parties. 34 C.F.R. § 106.8(b); 34 C.F.R. § 668.46(k)(2)(i).

247.    For evaluating whether a school's grievance procedures are "prompt and equitable," the Title IX guidance from OCR that was in effect at the time of the investigation of Professor Farzinpour identifies several elements, including whether the school "provides notice of . . . how to file a complaint, to . . . employees"; "ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; and "designates and follows a reasonably prompt time frame for major stages of the complaint process." *See* 2017 Q&A, *supra*, at 3.

248.    OCR's 2017 Q&A provides that in imposing "interim measures during the investigation of a complaint . . . a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator." *Id.*

249.    The First Circuit recognizes the erroneous outcome theory of liability, following the standard articulated by the Second Circuit in *Yusuf v. Vassar Coll.,* 35 F.3d 709 (2d Cir. 1994).

250.     To plead an erroneous outcome claim under Title IX, a Plaintiff found responsible for sexual harassment in a college disciplinary proceeding must allege: (1) facts sufficient to "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) "gender bias was a motivating factor." *Doe v. Trs. of Bos. Coll.,* 892 F.3d 67, 91 (1st Cir. 2018).

251.     With respect to the first element, Defendant Berklee College of Music's finding that Plaintiff was responsible for sexual harassment was utterly erroneous. The "pleading burden in this regard is not heavy" and can be met by alleging "particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715.

252.     Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation:

a.   The Investigator, by her own admission, investigated the case "through the lens of" the complainant.

b.   The Investigator did not interview Professor Farzinpour's wife, with whom he shared his first-hand account immediately after the alleged incident, who could have corroborated his account; yet the Investigator did interview Ms. Alali's boyfriend, with whom she shared her first-hand account after the alleged incident.

c.   The Investigator dismissed Professor Farzinpour's recounting of Ms. Alali's unwelcome sexual conduct toward Professor Farzinpour, including (i) asking whether he brought all of his students on "dates" there, (ii) thrusting out her chest while stating her bra size, (iii) asking about Professor Farzinpour's sexual relationship with his wife, (iv) asking if he would like to engage in a "threesome" with her and another Berklee student, (v) asking him to have sex with her in the restaurant bathroom, (vi) demanding repeatedly that he get them a hotel room for

sexual activity, (vii) pulling Professor Farzinpour toward her for cheek kisses goodbye, and (viii) while leaving, expressing her desire to go out with him again the following week.

d.   The Investigator ignored the statements of two Berklee students who came forward of their own accord to speak to the Equity Office about Plaintiff's good character and to report Ms. Alali's false boasting to a group of students, while the investigation was pending, that she was "the reason he got fired."

e.   Berklee denied Professor Farzinpour access to his email, disabling him from locating and presenting evidence that could corroborate his account.

f.   The Investigator failed to properly weigh exculpatory text messages that Ms. Alali transmitted to her boyfriend during the time that she was with Professor Farzinpour on the day of the alleged incident. The text messages detailed her state of mind and stated that her meeting with Professor Farzinpour was going well and that she was "good."

g.   Both the Investigator and Ms. Downes failed to acquire security footage from the day and location of the alleged incident, despite Plaintiff's early request.

h.   The Investigator ignored exculpatory evidence in the form of an audio recording wherein Ms. Alali acknowledged that she was "being such a good actor," "was testing him the whole time," and "[she] wanted to dig. [She] wanted to see like, what he wanted."

i.   The Investigator wrongly failed to credit that Professor Farzinpour did speak with Ms. Alali about meditation, health, and wellness, which he specifically referenced in his follow-up email to Ms. Alali the day after the alleged incident. The

53

Investigator falsely claimed that Farzinpour did not engage in any conversation about meditation, health, and wellness, contrary to evidence.

j. The Investigator falsely asserted that Professor Farzinpour took Ms. Alali on an obscure path so as not to be seen by members of the Berklee community. In fact, the path that Professor Farzinpour and Ms. Alali took was a highly visible one, regularly frequented by Berklee community members, as well as the shortest and most direct route to the Prudential Center. Moreover, the Investigator falsely asserted that Professor Farzinpour had taken Ms. Alali through the Cheesecake Factory, which was physically impossible, given the route they took. These errors point to the Investigator's failure to accurately gather facts and evidence.

253. Second, the circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, *inter alia:*

a. Failure to afford a presumption of innocence, as the Investigator conducted the investigation, by her own admission, "through the lens of" the complainant.

b. Berklee refused to allow Professor Farzinpour to file a sexual harassment complaint against Ms. Alali even though he alleged that she made him severely uncomfortable by engaging in conduct toward him that is explicitly mentioned in the Policy as examples of "unwelcome or unwanted sexual conduct": "[l]ewd remarks," "personal references to one's anatomy," "unwelcome sexual advances," "references to sexual conduct, gossip regarding one's sex life," "[s]exual exhibitionism," and "[i]nquiries into one's sexual activities." *Policy*, *supra*, at 4. Berklee refused to investigate Professor Farzinpour's complaint, even though OCR

required that any rights or opportunities that a school makes available to one party
should be made available to the other party on equal terms. 2017 Q&A, *supra* at 4.

c. The Investigator failed to interview Professor Farzinpour's wife, yet, inexplicably
interviewed Ms. Alali's boyfriend, though both similarly received immediate
reports after the alleged incident on the night it occurred. Berklee treated
analogously situated individuals unequally, even though OCR required that any
rights or opportunities that a school makes available to one party should be made
available to the other party on equal terms. 2017 Q&A, *supra* at 4.

d. Berklee prohibits retaliation, but the Policy and the Notice of Investigation stated
that "retaliation against a reporting party or witness may be violating Berklee
policy," without mention of potential retaliation against a respondent who similarly
participates in an investigation. *Id.* at 8. In its retaliation policy, Berklee clearly
flouted OCR's requirement that any rights or opportunities that a school makes
available to one party should be made available to the other party on equal terms.
2017 Q&A, *supra* at 4.

e. Berklee's ban on retaliation includes "causing third parties to take" retaliatory
action, but Berklee took no action to address Ms. Alali's retaliatory public social
media posts about her dissatisfaction with Berklee's sanction, and her boyfriend's
retaliatory public social media post naming Professor Farzinpour, which caused
third parties to take retaliatory action by plastering the campus with posters listing
his name as a sexual predator. In contrast to its egregious failure to address
retaliation against Professor Farzinpour for his participation in the investigation,

Berklee repeatedly warned Professor Farzinpour about the importance of non-retaliation.

f.   Berklee failed to address Ms. Alali's reported breach of confidentiality in her remarks to a group of students about Professor Farzinpour, even though it threatened the integrity of an ongoing investigation. In contrast, Berklee abruptly terminated Professor Farzinpour's employment, without notice or opportunity to be heard, ostensibly for violating "expectations," when he answered students' questions in class about the Title IX matter, after they, along with the public, had already seen Ms. Alali and Mr. Marinelli's public social media posts about the matter, as well as the signs posted around campus.

g.   Berklee imposed the interim measure of banning Professor Farzinpour from his teaching and from the campus upon receipt of Ms. Alali's complaint, prior to any inquiry or information-gathering whatsoever, suggesting that Berklee relied on blanket assumptions about gender rather than making an "individualized and appropriate" decision "based on the information gathered" as the 2017 Q&A requires. 2017 Q&A, *supra*, at 3.

h.   The Investigator looked with closed-minded skepticism upon Professor Farzinpour during the investigatory interviews as he shared his account of the events.

i.   Berklee terminated Professor Farzinpour, without any notice or opportunity to be heard, within weeks of his female accuser going public in social media posts urging Berklee to "DO SOMETHING," and embarrassing publicity putting pressure on Berklee to demonstrate that it takes sexual harassment by males seriously.

56

254.     Berklee's bias against Plaintiff as the accused male resulted in an erroneous finding of responsibility after a biased investigation, and eventually a wrongful termination motivated by gender bias.

255.     Berklee faced pressure to vindicate female complainants against male professors because of embarrassing public attention to the school's past failings.

256.     A *Boston Globe* investigation in 2017 had revealed that Berklee placed pressure on students to remain silent regarding blatant sexual harassment while the school quietly dismissed at least three professors. *See* Kay Lazar, *Berklee Let Teachers Quietly Leave After Alleged Sex Abuse, and Pushed Students for Silence*, *supra*.

257.     The pressure on Berklee to vindicate female students alleging sexual misconduct caused Berklee to subject Plaintiff to a biased and unfair process, which was tilted in favor of the female complainant and against the male respondent.

258.     After Berklee's finding and sanction, and after Plaintiff served his suspension, Ms. Alali's and Mr. Marinelli's public social media posts in early March 2020, and the resulting Boston Globe article on March 16, 2020, put unbearable pressure on Berklee to terminate Professor Farzinpour, as the male who was now accused publicly.

259.     Despite the fact that Berklee's investigation had resulted in imposition of a thirty-day suspension on Professor Farzinpour rather than a termination, the pressure on Berklee produced by the public claims that Berklee was too lenient on male faculty accused of sexual misconduct led Berklee to look for a pretext to relieve that pressure by terminating Professor Farzinpour.

260.     Berklee was motivated to fire the accused male professor in order to vindicate the accusing female complainant who, unsatisfied with Berklee's sanction of Professor Farzinpour,

went public and caused Berklee public embarrassment for allegedly not taking sexual harassment of women seriously enough.

261.     A college that is motivated to take adverse action against an accused male in order to respond to or protect itself from negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

262.     This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of fair process; loss of educational opportunities; and loss of future employment prospects.

263.     As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT II
## Breach of Contract

264.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

265.    Plaintiff signed an employment contract that expressly incorporated Berklee's policies, including the Non-Discrimination, Harassment, and Sexual Misconduct Equity Policy and Process.

266.    Based on the aforementioned facts and circumstances, Defendant breached express and implied agreements with Plaintiff. A non-exhaustive list of Defendants' breaches includes the following:

A.    *Failure to Conduct a "Thorough, Impartial, and Fair" Investigation*

267.    Berklee's Policy promises that the "investigation will be thorough, impartial, and fair, and all individuals will be treated with appropriate sensitivity and respect." *Berklee's Policy*, *supra*, at 15.

268.    Berklee failed to conduct a thorough, impartial, and fair investigation of the complaint against Plaintiff, in violation of its own policies.

269.    The Investigator failed to fairly examine the accounts of the complainant and the respondent. As revealed by her own admission, the Investigator investigated in a biased manner, "through the lens of" the complainant. The only impartial "lens" for conducting an investigation is a *neutral* lens that is neither the complainant's lens nor the respondent's lens.

270.    Additionally, the Policy states that the Chief Equity Officer/Title IX Coordinator, at the beginning of the investigation, "appoints trained, impartial individual(s) to conduct the investigation." *Berklee's Policy*, *supra*, at 14.

271.    Berklee failed to appoint a "trained, impartial individual" to conduct the investigation, as revealed by the Investigator's admitted evaluation of the matter "through the lens of" the complainant.

272.     Berklee failed to conduct a thorough investigation in failing to evaluate potentially exculpatory evidence including, but not limited to (i) text messages between Ms. Alali and her boyfriend; (ii) email messages between Professor Farzinpour and Ms. Alali; and (iii) an audio recording in which Ms. Alali admitted her underlying motive for meeting with Professor Farzinpour and cast doubt on the sincerity of her claims.

273.     By excluding Professor Farzinpour from access to his own email account, Berklee prevented him from finding and presenting critical emails necessary to defend himself, and failed to gather relevant evidence, thus resulting in an incomplete investigation.

274.     Berklee failed to conduct a thorough, impartial, and fair investigation when it failed to interview Professor Farzinpour's wife. When he returned home after the alleged incident, he immediately shared his account with his wife. Similarly, Ms. Alali returned home and shared her account with her boyfriend. Inexplicably, the Investigator interviewed Ms. Alali's boyfriend for the investigation, but did not interview Professor Farzinpour's wife, who could have corroborated his account. There is no good reason to interview one but not the other, and the failure indicates a lack of thoroughness, impartiality, and fairness.

275.     Berklee unfairly pre-determined the party whose narrative it would believe, and left the complainant's erroneous account insulated from challenge.

B. _Failure to Gather and Consider All Relevant Evidence_

276.     The Policy promises that "[t]he investigator will interview . . . all relevant witnesses, and gather any relevant evidence (such as texts/emails, social media postings, surveillance video, photos), and consider all relevant evidence." _Id._ at 15.

277.     As stated above, the Investigator failed to interview Professor Farzinpour's wife, refused him access to his emails in order to gather relevant materials for the investigation, and

failed to consider potentially exculpatory evidence including, but not limited to (i) text messages between Ms. Alali and her boyfriend; (ii) email messages between Professor Farzinpour and Ms. Alali; and (iii) an audio recording in which Ms. Alali admitted to her underlying motive for meeting with Professor Farzinpour and cast doubt on the sincerity of her claims.

### C.  *Failure to Provide Equal Opportunity to Share Information*

278.     The Policy promises that "[d]uring the investigation, the parties will have an equal opportunity to share information and request that witnesses be interviewed." *Id.*

279.     The Investigator plainly did not provide the parties this equal opportunity.

280.     Specifically, as discussed above, the Investigator chose to interview Ms. Alali's boyfriend while choosing not to interview Professor Farzinpour's wife, when they were both similarly and analogously relevant witnesses with respect to corroboration of each party's account.

281.     Also as discussed above, because Berklee locked Professor Farzinpour out of his Berklee email account, he did not have the opportunity to share information that was contained in his emails.

### D.  *Failure to Provide Access to Evidence*

282.     The Policy promises that "[b]efore a determination is made," the parties will "be given the opportunity to review a summary of relevant evidence, including their own statements[,]" and be allowed to "submit any comments about this summary to the investigator within five (5) calendar days." *Id.*

283.     The Policy promises this opportunity to all parties, and makes no mention that such access could be conditional on a party agreeing to not "save, copy, print, photograph, or otherwise preserve or reproduce the documents provided," or to "send, forward, or otherwise share the

documents with anyone," all of which would seriously impair a party's ability to properly seek effective advice of counsel.

284.    Professor Farzinpour was not given the opportunity to review a summary of the evidence or a chance to submit comments to it before Berklee made the determination of responsibility.

285.    At the end of the evidence-gathering, Berklee refused to allow Professor Farzinpour to have access to the evidence unless he agreed to sign a document waiving his right to "send, forward, or otherwise share the documents with anyone," or to "save, copy, print, photograph, or otherwise preserve or reproduce the documents provided."

286.    Professor Farzinpour reasonably interpreted Berklee's conditions as disabling him from sharing the materials with his attorney for the purpose of obtaining adequate advice of counsel on his legal rights to fair process and on potential legal action against Berklee for its unlawful actions. He therefore refused to sign the waiver.

287.    Berklee refused to share the evidence gathered with Professor Farzinpour and therefore he was unable to review or submit comments on the evidence.

288.    Professor Farzinpour was not given access to the evidence throughout the investigation, and finally saw the evidence only after Berklee issued its final report, outcome, and sanctions, in December 2019.

289.    Even though the Policy does not state that parties' access to evidence will be conditional upon their agreeing to waive certain rights, Berklee imposed unreasonable conditions on Professor Farzinpour's access to evidence - conditions that appeared to impair his ability to seek effective advice of counsel about that evidence.

290.   By attempting to force Professor Farzinpour to sign a waiver giving up his ability to transmit the evidence to his attorney to obtain legal counsel, and then refusing to show him the evidence when he did not agree, Berklee breached its promise in the Policy that parties will be shown the evidence and have a chance to respond to it.

E.   *Failure to Properly Apply the "Preponderance of the Evidence" Standard*

291.   The Policy promises that the "[t]he investigator will then review all relevant evidence and determine whether or not the responding party is responsible or not responsible for each allegation, using a preponderance of the evidence standard." *Id.* at 16.

292.   The Investigator failed to apply this standard in reviewing the evidence and finding Professor Farzinpour responsible for sexual harassment.

293.   First, the Investigator did not in fact "review all relevant evidence." For example, the Investigator denied Plaintiff's requests that Berklee attempt to obtain security video footage that could support his account, interview his wife, consider the testimony of other supporting student witnesses, and allow him to access his email so that he could produce exculpatory evidence.

294.   The Investigator wrongly overlooked evidence that, when considered in combination by any reasonable investigator, could lead only to the conclusion that Ms. Alali was not in fact the victim of sexual harassment by Professor Farzinpour, but rather, a perpetrator of sexual harassment against Professor Farzinpour. A non-exhaustive list includes the evidence that Ms. Alali (i) lured Professor Farzinpour out under the guise of seeking advice on meditation and yoga; (ii) repeatedly pushed a sexual agenda; (iii) propositioned Professor Farzinpour to have sexual intercourse with her in the bathroom, which he rebuffed; (iv) repeatedly demanded that he procure a hotel room for sexual intercourse, which he refused to do; (v) asked Professor Farzinpour

to engage in a "threesome" with her and another Berklee student; (vi) pulled Professor Farzinpour in to kiss him on the cheeks goodbye, (vii) asked Professor Farzinpour about his sexual relationship with his wife; (viii) admitted on the Recording that she was "wanted to test" Professor Farzinpour and that she was "being such a good actor"; and (ix) sent text messages to her boyfriend during her time with Farzinpour indicating that all was going well and she was "good."

295.    The Investigator failed to consider evidence available from two Berklee students, who went of their own accord to the Equity Office to testify that Ms. Alali falsely bragged to about a dozen Berklee students she did not know, at Earls Kitchen + Bar, that she was "the reason he got fired."

296.    The Investigator improperly discounted evidence that supported Professor Farzinpour's account, specifically, email messages that detailed Ms. Alali's alleged purpose for asking to meet with him: to discuss yoga and meditation retreats.

297.    Had the Investigator correctly applied the prescribed "preponderance of the evidence" standard, she would have reached the only plausible conclusion, namely, that Professor Farzinpour did not harass Ms. Alali, but that Ms. Alali had harassed Professor Farzinpour.

F.   *Berklee's retaliation Against Professor Farzinpour*

298.    The Policy prohibits "retaliation against any person who . . . participates in an investigation of possible discrimination," and defines retaliation as "any conduct . . . that interferes with . . . a person's rights to access education and/or work."

299.    Ms. Alali's social media posts in March 2020 called on Berklee to "DO SOMETHING" about Professor Farzinpour. Berklee did "do something" in response the ensuing publicity around the case, after the Boston Globe article of March 16, 2020, which named both Ms. Alali and Professor Farzinpour.

300.    Berklee's President, Roger Brown, sent an email to the entire Berklee Community on March 17, 2020, the day after the Boston Globe article, confirming that one of the "three cases" that the article detailed as being "reported to the Equity Team" had "led to a serious sanction."

301.    President Brown stated that "social media has an important role in illuminating the experiences of survivors," and described Berklee's equity process as exposing "the ugly and reprehensible."

302.    The President's email had the effect of publicly confirming, clearly identifying, and singling out Professor Farzinpour, even though, like many colleges, Berklee generally does not comment publicly on specific personnel matters.

303.    President Brown's email was retaliatory in violation of Berklee's Policy on retaliation.

304.    The email encouraged others at Berklee to retaliate against Professor Farzinpour.

305.    Ultimately, Berklee's retaliation led to its finding a weak pretext to terminate Professor Farzinpour, despite the fact that Berklee's investigative process had produced the outcome of a thirty-day suspension.

### G. *Failure to Address Retaliation Against Professor Farzinpour*

306.    The Policy "prohibits retaliation against any person who, in good faith . . . participates in an investigation of possible" harassment. It promises that retaliation against an individual "for assisting in providing information in the context of an investigation or disciplinary proceeding pursuant to this policy . . . will be subject to discipline pursuant to this policy and the Equity Complaint Process." *Berklee's Policy*, *supra*, at 8.

307.    Berklee entirely failed to respond to reports to the Equity Office, while the investigation was pending, by several Berklee students with first-hand accounts, that Ms. Alali

approached approximately a dozen Berklee students who were unknown to her, at Earls Kitchen + Bar, and boasted that she was the one who got him fired.

308.    Inexplicably, Berklee failed to take any action even to inquire into the report of this retaliatory act, despite the fact that it was potentially harmful to the integrity of the ongoing investigation.

309.    Berklee's failure was particularly stark when compared to its pointing to the policy against retaliation to refuse to allow Professor Farzinpour to file a sexual harassment complaint against Ms. Alali.

310.    Berklee's use of its retaliation policy to justify suppressing the exercise of Professor Farzinpour's rights as a complainant of harassment under the Policy, combined with Berklee's refusal to take any action even to inquire into Ms. Alali's violation of the retaliation policy, and its harshness in imposing an absolute ban on Professor Farzinpour's physical presence on campus during his administrative leave, illustrated Berklee's bias in investigating the complaint against Professor Farzinpour, and its predetermination of his guilt.

311.    After Professor Farzinpour served the suspension that Berklee imposed and returned to teaching, Ms. Alali and Mr. Marinelli retaliated against Professor Farzinpour by posting on social media about the case and rebuking Berklee for choosing a sanction that allowed Professor Farzinpour to return to teaching. Mr. Marinelli's post named Professor Farzinpour.

312.    This conduct was retaliation under the Policy, which prohibits retaliation against a person who "participates in an investigation of possible discrimination," and defines retaliation as conduct that "interferes with" that person's "right to access education and/or work." Ms. Alali's and Mr. Marinelli's conduct clearly interfered with Professor Farzinpour's access to work.

313.     Yet, Berklee took no action in response to Ms. Alali's and Mr. Marinelli's damaging acts of retaliation, despite Berklee's clear policy promising that retaliation "will be subject to discipline pursuant to this policy and the Equity Complaint Process."

H.     *Failure to Conduct a Timely Review of the Complaint*

314.     The Policy promises that it will "conduct a timely review of all complaints and will endeavor to complete review and resolution within sixty (60) calendar days from receipt of the complaint to notification of outcomes." It further promises that "[i]n the event that such time frames will not be met, the parties will be kept informed." *Berklee's Policy*, *supra*, at 19.

315.     Berklee conducted an investigation spanning well over sixty days. Berklee received the complaint in late July 2019, and Professor Farzinpour first learned of it on July 30, 2019.

316.     Berklee completed all interviews of parties and witnesses by August 30, 2019.

317.     However, the Investigator did not issue a final report and outcome until December 13, 2019.

318.     Berklee did not keep Professor Farzinpour informed that the time frames would not be met, contrary to what the Policy promised.

319.     The inexplicable delay caused Professor Farzinpour to lose more than an entire semester as a professor at Berklee, as he remained on involuntary administrative leave for more than twice the time that he would have expected given the provided time frame in the Policy.

320.     Berklee's delay exponentially harmed Professor Farzinpour's reputation, as his absence from teaching had to span three semesters rather than two, and meant that his return to the classroom was in mid-semester, which was far more conspicuous and disruptive than if it had been at the beginning of the semester.

I.   *Failure to Conduct Any Process Whatsoever Before Terminating Professor Farzinpour*

321.   The Policy provides for "involuntary termination" as the most severe sanction for violation of the Policy. *Berklee's Policy*, *supra*, at 16.

322.   Berklee's investigation process conducted from late July 2019 to December 13, 2019, resulted in the sanction of suspension for thirty days.

323.   The Policy promises to conduct a thorough, impartial, and fair process before reaching any determination on responsibility and imposing any sanction.

324.   Yet, after Professor Farzinpour fully served his suspension, and less than two months after his reinstatement, Berklee abruptly terminated Professor Farzinpour.

325.   The termination resulted from a determination by his department chair, Mr. Carrick, that Professor Farzinpour had allegedly acted "in conflict with the expectations outlined for you" in the December 13, 2019 outcome letter.

326.   The outcome letter had only directed Professor Farzinpour to "consistently conduct yourself in a manner that upholds the values of the institution and profession: values of respect and modeling appropriate conduct and interactions both in and outside the classroom." It had warned that "any further violations of Berklee policy or standards of conduct, or willful disregard for expectations, . . . will result in the termination of your employment."

327.   The conduct that Mr. Carrick found "in conflict" with "expectations" was that Professor Farzinpour had answered the queries of students in his class who pressed him to address Ms. Alali's and Mr. Marinelli's public social media posts about him and the posters plastered on campus naming him. In the course of doing so, Professor Farzinpour had spoken negatively about Berklee's unfair investigation process.

328.     Neither the outcome letter nor any other communication from Berklee had ever previously put Professor Farzinpour on notice that he could not speak about his own experience of Berklee's investigation process. He had not been aware of violating any rule or expectation by speaking about his own experience, particularly after the fact of Berklee's finding of responsibility had been made public, to his chagrin, in the *Boston Globe* and in social media postings by the complainant and her boyfriend.

329.     The Policy promises that, should "new information come to light that results in the need to charge the responding party with additional violations, . . . the parties will be provided with an updated, written letter setting forth the new allegations." Berklee's Policy, at 15.

330.     Professor Farzinpour was never provided with an updated notice or a notice of new allegations.

331.     Berklee terminated Professor Farzinpour without any notice or opportunity to be heard. It did not specify what particular Berklee policy he had violated. Berklee did not explain how he failed to conduct himself "in a manner that upholds the values of the institution and profession: values of respect and modeling appropriate conduct and interactions both in and outside the classroom," as required in his outcome letter. Berklee did not give him the opportunity to respond to an allegation that he had violated any "expectation." It did not conduct any process through the Equity Office for any Policy violation.

332.     Termination of employment is the most severe sanction. There was nothing in the "final written warning" that Professor Farzinpour received in the outcome letter that suggested that if he were later simply alleged to have violated vague "expectations outlined" there, his rights under Berklee's disciplinary policies — notice of allegations, an opportunity to be heard, an investigation, and fair determination — would simply disappear.

333.    In imposing the sanction of termination on Professor Farzinpour without any process whatsoever, Berklee breached its promise to conduct a thorough, impartial, and fair process before finding him responsible and imposing a sanction.

334.    The foregoing violations, individually and in the aggregate, resulted in a process that was neither fair nor impartial, ultimately resulting in an erroneous finding against Plaintiff, wrongful suspension, wrongful termination, and the resultant damages to his reputation and professional career as a musician, a teacher, and an academic.

335.    As a direct and proximate result of the above conduct, Professor Farzinpour has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT III
## Denial of Basic Fairness

336.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

337.    Plaintiff's employment contract with Berklee contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any disciplinary proceedings would be conducted with basic fairness.

338.    Massachusetts courts have held as part of the implied covenant of good faith and fair dealing that school disciplinary hearings must be "conducted with basic fairness." *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (citing *Coveney v. President & Trs. of Holy Cross Coll.*, 445 N.E.2d 136, 139 (Mass. 1983)); *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 380 (Mass. 2000).

339.     Consistent with the implied covenant of good faith and fair dealing, Berklee's Policy also explicitly promises that the "investigation will be thorough, impartial, and fair, and all individuals will be treated with appropriate sensitivity and respect." *Berklee's Policy*, *supra*, at 15.

340.     Thus, Defendants owed a duty to ensure that the proceedings against Professor Farzinpour were conducted in good faith and with basic fairness.

341.     In the context of a college discipline process, "there are two principal threads to the 'fairness' inquiry. The first is procedural fairness — that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself. The second is substantive fairness — that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness." *Brandeis Univ.*, 177 F. Supp. 3d at 601–02.

342.     Defendants breached the duty to provide basic fairness when it conducted an investigation that was so stacked in favor of complainant and against respondent that it denied Plaintiff any fair chance to defend himself.

343.     Defendants breached the duty to provide basic fairness when it reached outcomes that that were irrational and tainted by bias.

A.   *Failure to Provide Access to Evidence Collected*

344.     Berklee offered Professor Farzinpour the opportunity to review the evidence it had gathered in the investigation, only upon its unfair condition that Professor Farzinpour waive his rights to show the materials to his attorney. Unwilling to waive his right to seek advice of counsel on the materials for the purpose of challenging the unfairness of the process or of bringing legal action, Professor Farzinpour did not sign the waiver, and thus was forced to participate in the

investigation process without access to the evidence that Berklee gathered. He therefore had no opportunity to respond to that evidence in his defense.

345.    Berklee did not permit Professor Farzinpour to review any of the evidence until after it issued the final report and outcome. Professor Farzinpour appeared for two interviews while in the dark about information that would have aided in preparing his defense. He was not given the chance to respond to what other witnesses said, or to view the text messages, email messages, or the Recording, all of which he would have responded to in his defense.

346.    Having never been able to access the evidence during the investigation, it was only after the final report and outcome, in his appeal, that he was able to respond to the evidence gathered and to the many points that the Investigator failed to address.

   B.  *Failure to Employ a Presumption of Innocence*

347.    Fundamental fairness requires that an accused individual be presumed innocent, and that Berklee have the burden of proof to establish otherwise.

348.    Berklee violated this obligation when it presumed Professor Farzinpour guilty from the outset and operated from the assumption that he was responsible for a violation of the Policy.

349.    Immediately upon receiving a complaint, Berklee placed Professor Farzinpour on administrative leave, banned him from teaching, cut off his access to his emails, and told him he "should refrain from participating in any Berklee activities, whether on or off campus." Berklee imposed this blanket measure without giving him any notice or opportunity to be heard. Professor Farzinpour was not consulted, not allowed to tell his side of the story, and not heard on what interim measures would be appropriate. He was not determined to be a threat to anyone's safety.

350.    Immediately placing a respondent on administrative leave and banning him from teaching and from campus before conducting any investigation at all is a breach of a respondent's reasonable expectation that he will be assumed not responsible until proven otherwise.

351.    Berklee further demonstrated its implied use of a presumption of guilt when the Investigator admitted that she conducted the investigation "through the lens of the student," the complainant. By conducting the investigation in this manner, the Investigator unfairly limited consideration of the viewpoint of the accused party.

352.    Berklee also revealed its presumption of guilt when the Investigator failed to interview Professor Farzinpour's wife and did not permit Professor Farzinpour to access and review his emails in order to identify potentially exculpatory evidence.

353.    Berklee's process presumed Professor Farzinpour was guilty from the time the complaint was received. The investigation was conducted with the goal of reaching the predetermined result of finding the accused responsible for sexual harassment.

C.  *Failure to Separate Investigation and Adjudication*

354.    The Policy utilizes an "investigator-only" or "single-investigator" model, wherein one or more investigators interview the parties and witnesses, collect evidence, prepare a report, and make findings of responsibility, which may only be challenged and reviewed on very limited grounds. Because this model of combining the roles of investigation and adjudication in one person or set of people leads to bias and unfairness, it is now unlawful under the Department of Education's final Title IX regulations, published on May 19, 2020 and set to be implemented on August 14, 2020.

355.    The failure to separate out the investigation and adjudication functions results in an unfair process. "The dangers of combining in a single individual the power to investigate,

prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions." *Brandeis,* 177 F. Supp. 3d at 606.

356.    Under the "investigator-only" model, one individual may be "given complete authority to decide whether the accused [is] 'responsible' for the alleged violations," acting "simultaneously [as] the investigator, the prosecutor, and the judge who determine[s] guilt." *Id.* at 579.

357.    This "investigator-only" model has been criticized by judges and commentators because it offers no checks or balances against investigator bias, including unconscious racial or gender bias; it allows a single individual to act as prosecutor, investigator, judge, and jury determining guilt; and, crucially, it allows the Investigator to find the accused guilty without ever affording him a hearing where evidence can be challenged, witnesses questioned, and the parties cross-examined in some form.

358.    Pursuant to Berklee's policies, the Investigator prepares a final report, which includes a summary of the findings and determination of responsibility. This final report is submitted to Berklee's Equity Office for review and for approval by the Chief Equity Officer/Title IX Coordinator, who is supposed to "oversee each investigation and ensure sufficiency of evidence gathered, that the facts gathered support the findings, that best practices are followed, and that each allegation is addressed in the investigator's summary report," effectively rubber stamping the Investigator's decision and depriving the accused of an adjudication that is independent of the investigation. *Berklee's Policy*, *supra*, at 16.

359. Professor Farzinpour's inability to be heard before an impartial, independent decisionmaker, and to submit to and subject the complainant to questioning in order to test credibility and truth-telling, substantially prejudiced him and adversely affected the outcome.

360. The foregoing constituted Defendants' violations of Professor Farzinpour's right to basic fairness.

361. As a direct and proximate result of the above conduct by Defendants, Professor Farzinpour has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT IV
## ESTOPPEL

362. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

363. In Massachusetts, a plaintiff alleging estoppel must demonstrate: (1) a representation intended to induce a course of conduct on the part of the person to whom the representation was made, (2) an act or omission resulting from the representation by the person to whom the representation was made, and (3) detriment to the person as a consequence of the act. *Boutilier v. John Alden Life Ins. Co*., No. 98-30189-KPN, 2000 WL 1752623, at *9 (D. Mass. Sept. 29, 2000).

364. Berklee's various policies constitute representations and promises that Berklee should have reasonably expected to induce action or forbearance by Plaintiff.

365. Berklee expected or should have expected Professor Farzinpour to accept its offer of employment and choose not to pursue employment at other colleges or universities based on its express and implied promised that Berklee would not tolerate, and Plaintiff would not suffer,

discrimination or harassment, and would not deny Plaintiff basic fairness in its disciplinary procedures should he be accused of a violation of Berklee's policies.

366.    Plaintiff relied to his detriment on these express and implied promises and representations made by Berklee, and chose to further his career at Berklee instead of schools of equal caliber.

367.    Based on the foregoing, Berklee is liable to Plaintiff based on Estoppel.

368.    As a direct and proximate result of the above conduct, Plaintiff Farzinpour has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT V
## NEGLIGENCE

369.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

370.    In Massachusetts, a Plaintiff must demonstrate that: (1) the defendant owed a duty, (2) the defendant breached that duty, (3) a causal connection exists between the breach of duty and (4) plaintiff's suffering of damages. *Adams v. Cong. Auto Ins. Agency, Inc.*, 65 N.E.3d 1229, 1234 (2016).

371.    In conducting its investigation and adjudication of Ms. Alali's complaint against Plaintiff, Berklee owed a common law duty to exercise reasonable care, with due regard for uncovering the truth, applying Berklee's procedures fairly and impartially, appreciating the severity of charges and potential consequences, and in consideration of Professor Farzinpour's fundamental rights to a fair process.

372.     Through the acts set forth above, Berklee breached its duty by carelessly, improperly, and negligently performing its investigation through a process that violated the rights and interests of Plaintiff.

373.     Specifically, the College negligently trained and supervised the individuals it employs to serve as investigators and adjudicators in Title IX disciplinary proceedings, making them unfit to serve in these critical roles.

374.     Berklee's negligent training and selection of its investigators was evident in the Investigator's admission that she was conducting the investigation and evaluating the evidence through the lens of *one* party, the complainant. As a result, the Investigator failed to conduct the investigation in the impartial and unbiased manner required by the Policy.

375.     Moreover, Berklee demonstrated its negligence when it failed to take any action in response to a clear violation of Professor Farzinpour's right to confidentiality and freedom from retaliation in the Title IX disciplinary process.

376.     Specifically, when Professor Farzinpour reported the false statements made by Ms. Alali, the College took no action to discipline Ms. Alali for her retaliatory conduct.

377.     Berklee condoned Ms. Alali's violation of confidentiality and retaliatory conduct when it refused to take any action.

378.     A non-negligent higher education institution conducting a Title IX disciplinary proceeding would have ensured that its personnel were thoroughly familiar with the rights that its Policy promised and were capable of carrying out the investigatory procedure in a fair and impartial manner to ensure a correct outcome.

379.     As a direct and proximate result of the above conduct, Professor Farzinpour has sustained tremendous damages, including, without limitation, emotional and psychological

distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

380.    Accordingly, the College is liable to Professor Farzinpour for negligence and for all damages arising therefrom.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

381.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

382.    The Defendants' conduct, as described above, caused Plaintiff mental anguish and emotional distress.

383.    Professor Farzinpour's mental anguish and emotional distress were severe enough that they might result in bodily harm or illness. Professor Farzinpour's doctor increased his medication dosage and prescribed new medications, and he had to receive numerous ketamine treatments in Los Angeles and New York in order to attempt to treat his depression and migraine headaches.

384.    Due to the extreme stress Professor Farzinpour experienced during this unfair process, Professor Farzinpour suffers from severe depression, anxiety, and migraine headaches, which impact his daily life. He has been unable to fully perform his duties for ENSEMBLE / PARALLAX, despite an important and rigorous schedule of events.

385.    The Defendants' conduct caused Professor Farzinpour severe and substantial mental anguish and emotional distress. As a result, Plaintiff suffered from anxiety, depression, and severe migraine headaches as detailed above.

386.     As result of the foregoing, Plaintiff has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Peyman Farzinpour demands judgment against Defendants as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, Erroneous Outcome, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction enjoining enforcement of the suspension and his termination, expunging Plaintiff's records, and requiring Berklee to destroy all disciplinary records concerning Plaintiff;

(ii)     on the second cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for denial of basic fairness under contract and common law, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and

performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational and career opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of career and performance opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vi)    on the sixth cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of career and performance opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vii)    a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Berklee be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension be removed from his file; (v) the record of Plaintiff's termination be removed from his file; (vi) any record of the complaint against Plaintiff be permanently destroyed; (vii) Plaintiff be reinstated to employment as an Associate Professor at Berklee; and (viii) Plaintiff be awarded such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: Boston, Massachusetts
      May 26, 2020

                    Respectfully submitted,

                    **NESENOFF & MILTENBERG, LLP**
                    *Attorneys for Plaintiff Peyman Farzinpour*

                    By: /s/ *Tara J. Davis*

                    **Andrew T. Miltenberg, Esq. (*Pro Hac Vice pending*)**
                    **363 Seventh Avenue, Fifth Floor**
                    **New York, New York 10001**
                    **(212) 736-4500**
                    **amiltenberg@nmllplaw.com**

                    **Tara J. Davis (BBO # 675346)**
                    **Regina M. Federico (BBO #700099)**
                    **101 Federal Street, Nineteenth Floor**
                    **Boston, Massachusetts 02110**
                    **(617) 209-2188**
                    **tdavis@nmllplaw.com**
                    **rfederico@nmllplaw.com**

                          **-and-**

                    **Jeannie Suk Gersen (BBO# 601070)**
                    **1563 Massachusetts Avenue**
                    **Cambridge, Massachusetts 02138**
                    **(617) 496-8834**
                    **jsuk73@gmail.com**