**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ───────────────────────────── ) | |
| PEYMAN FARZINPOUR,                    ) | |
|                                       ) | |
|                    Plaintiff,         ) | |
|                                       ) | Civil Action |
| v.                                    ) | No. 20-11003-PBS |
|                                       ) | |
| BERKLEE COLLEGE OF MUSIC,             ) | |
|                                       ) | |
|                    Defendant.         ) | |
| ───────────────────────────── ) | |

**MEMORANDUM AND ORDER**

January 26, 2021

Saris, D.J.

**INTRODUCTION**

Plaintiff Peyman Farzinpour, an associate professor, was terminated from his employment by defendant Berklee College of Music (Berklee) after complaining that a Title IX proceeding involving allegations of sexual harassment made by one of his students against him had been biased. He claims that Berklee violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); and state law. Berklee has moved to dismiss.

After hearing, the Court **DENIES** Berklee's motion to dismiss Farzinpour's Title IX claim; **DENIES** Berklee's motion to dismiss

Farzinpour's retaliation claims; and **ALLOWS** Berklee's motion to dismiss Farzinpour's remaining state law claims.[1]

<u>FACTUAL BACKGROUND</u>

Unless otherwise noted, the following facts are drawn from the complaint and must be taken as true at this juncture. <u>See</u> <u>Foley v. Wells Fargo Bank, N.A.</u>, 772 F.3d 63, 71-72 (1st Cir. 2014).

A.   **Farzinpour's employment**

Farzinpour began working as an Assistant Professor in the Berklee Composition department in the fall of 2014.  By fall of 2019, Farzinpour had been promoted to the rank of Associate Professor.  His employment contract with Berklee, which was scheduled to run from September of 2018 through May of 2021, provided that Farzinpour's appointment was "made in accordance with and governed by the policies of the Board of Trustees and the College."  Dkt. 19 ¶¶ 34, 35.

One such policy, the Non-Discrimination, Harassment, and Sexual Misconduct Equity Policy and Process (the "Equity Policy"), "prohibits acts of discrimination, harassment, and sexual misconduct, including, but not limited to, sexual assault or harassment, domestic/dating violence, and stalking."  Dkt. 19

---

[1] Farzinpour's state-law claims include claims of breach of contract (Count II), denial of basic fairness (Count III), estoppel (Count IV), negligence (Count V), and negligent infliction of emotional distress (Count VI).

¶¶ 36-37.  It further prohibits "retaliation against any person who, in good faith, reports, assists in reporting, or participates in an investigation of possible discrimination, harassment, or sexual or gender-based misconduct."  Dkt. 19 ¶ 46.  The Equity Policy also delineates the process for conducting investigations, promising that investigations will be "thorough, impartial, and fair."  Dkt. 19 ¶ 54.

Berklee's "Relationships Policy," in turn, prohibits "dating, romantic, or sexual relationships between students, . . . and faculty."  Dkt. 19 ¶ 71 (alteration in original).  It also explains that "[f]aculty or staff . . . who violate this policy are subject to corrective action up to and including termination of employment."  Dkt. 19 ¶ 72 (alteration in original).

Berklee has submitted record evidence showing that Farzinpour's 2018 appointment letter further stipulated that his appointment was "governed by . . . the Collective Bargaining Agreement [CBA] between the College and the Berklee Chapter of the Massachusetts Federation of Teachers Union."  Dkt. 13-1 at 2.

**B.    The Title IX investigation**

    **1.    Allegations of harassment and the Title IX complaint**

In late July of 2019, Farzinpour was accused of sexual harassment by an undergraduate student in his conducting class. Farzinpour and the student had gone to several off-campus restaurants and bars together during one evening after class. In a complaint filed with Berklee, the student alleged that Farzinpour had made "numerous unwelcome sexual advances" toward her during that evening.  Dkt. 19 ¶ 129.  The student alleged that Farzinpour had "comment[ed] on her physical appearance, for example, her breasts and body shape; express[ed] a sexual attraction towards her; and suggest[ed] that they engage in sexual activity."  Dkt. 19 ¶ 129.  The student also alleged that Farzinpour "violated Berklee's relationships policy by participating in a date or attempting to engage in a dating or sexual relationship with a student."  Dkt. 19 ¶ 130.

Farzinpour, for his part, denied the allegations and claimed that the student had, in fact, sexually harassed him. He claims in his complaint, for instance, that the student had brought up the topic of her breast and body shape and had sexually propositioned Farzinpour during the outing.  He further alleges that he repeatedly rebuffed the student's advances.

## 2.   The August 5, 2019 interview

Farzinpour was put on administrative leave as a result of the complaint filed against him.  Shortly thereafter, on August 5, 2019, Farzinpour met with Kelly Downes, the Berklee Chief

Equity Officer and Title IX Coordinator.  Downes explained the
Title IX disciplinary process to Farzinpour and informed
Farzinpour that the "investigation process would be fair,
equitable, and balanced."  Dkt. 19 ¶ 139.  She also explained
that Farzinpour had the option of requesting an investigation of
the student who had reported him if he felt that the student had
engaged in harassing behavior.

After this initial meeting, Farzinpour was interviewed by
the Title IX Investigator, Jaclyn Calovine.  Farzinpour alleges
that during the interview Calovine "displayed behavior that
indicated her bias against [him]" by making a "very surprised
and disapproving facial expression" when learning that
Farzinpour met with students over coffee or meals and by
assuming that Farzinpour had intentionally organized meetings in
public places "so there would be cameras around."  Dkt. 19
¶¶ 144–45.  Farzinpour complained at the end of the meeting that
"the Equity Office distributed literature and associated
promotional products that are one-sided in support of women."
Dkt. 19 ¶ 152.

### 3.   Farzinpour's report of sexual harassment

On August 8, 2019, Farzinpour emailed Downes and Calovine
to report the student for sexual harassment.  Shortly
thereafter, Downes replied that she had decided not to issue a
complaint at the time based on Farzinpour's report.  Downes

explained that it was "appropriate to give special care to the complaint to ensure that it is not retaliatory in nature" and stated that she would reassess Farzinpour's report once Calovine had gathered more details.  Dkt. 19 ¶ 157.  Berklee never issued a complaint against the student.

### 4.  Alleged retaliation by the student

Sometime in August 2019, the Equity Office received notification from several Berklee students that the student who had reported Farzinpour had discussed the Title IX proceeding with them.  Allegedly, the student had approached a large group of Berklee students at a restaurant near campus and "proceeded to share with [them] a false and graphic story of the alleged incident, tarnishing Professor Farzinpour's name and reputation."  Dkt. 19 ¶¶ 160, 161, 163.  The student had also allegedly falsely claimed to the group that she had "gotten Farzinpour fired."  Dkt. 19 ¶ 161.  Farzinpour learned of this incident and emailed and called Downes out of concern for this alleged breach of confidentiality.  Downes did not respond to Farzinpour's messages.

### 5.  August 30, 2019 interview

On August 30, 2019, Farzinpour underwent a second interview with Calovine.  Farzinpour's sister, who was acting as his legal advisor, was present during this meeting.  Calovine asked Farzinpour for information about times and dates related to the

alleged harassment incident, despite knowing that Farzinpour did
not have access to his Berklee email account because of the
administrative leave imposed upon him.  Calovine informed
Farzinpour that she had conducted witness interviews with the
student who had reported him, the student's boyfriend, and
Farzinpour, but not Farzinpour's wife.  When Farzinpour
complained during this interview that the investigation process
was not fair and unbiased, Calovine explained that the
investigation was being conducted "through the lens of the
student."  Dkt. 19 ¶ 178 (emphasis removed).

At the end of the interview, Farzinpour's sister inquired
about filing a complaint against the reporting student.
Calovine allegedly falsely implied that Berklee could take no
further action against the student because she was no longer on
campus, even though the student did not graduate until May 2020.

**6.    Prohibition against using rehearsal rooms**

A July 30, 2019 Notice of Investigation Letter sent to
Farzinpour by Berklee stated, "While on leave, you should
refrain from participating in any Berklee activities, whether on
or off campus."  Dkt. 19 ¶ 184.  Farzinpour interpreted this
prohibition to mean that he could continue to use Berklee's
campus facilities.  Farzinpour proceeded to meet with several
colleagues, including one Berklee colleague, for on-campus
rehearsals on three separate occasions.  After discovering

Farzinpour's on-campus activity, Berklee threatened to arrest and charge Farzinpour if he entered the Berklee campus again during his administrative leave.

**7.   Berklee's final report**

More than four months after the investigation began, Berklee issued its final report on December 13, 2019.  The report found Farzinpour responsible for sexual harassment but not responsible for violating the Berklee Relationships Policy. The sanctions imposed on Farzinpour included:

> (i) an unpaid suspension of thirty days, (ii) mandatory training, (iii) a ban on private off-campus meetings with students, (iv) a permanent ban on use of Berklee facilities "for purposes that are not directly related to [Farzinpour's] teaching responsibilities," (v) ineligibility for non-contractual work and Berklee's Summer Sessions, and (vi) a final written warning.

Dkt. 19 ¶ 202.  The final written warning stated, "Please understand that any further violations of Berklee policy or standards of conduct, or willful disregard for expectations . . . will result in the termination of your employment."  Dkt. 19 ¶ 205 (alteration in original).

Farzinpour appealed the findings of the report in January 2020, but his appeal was denied.  In February 2020, Farzinpour filed a grievance claim pursuant to Article 11 of the Grievance Procedures of the CBA with the Berklee Teacher's Union.  The grievance claim was likewise denied.

**8.   Public discussion of sexual harassment at Berklee**

After serving his 30-day suspension, Farzinpour returned to campus on February 20, 2020.  The student who had reported Farzinpour subsequently posted a Facebook message deriding Farzinpour's reinstatement, calling the suspension a "slap on the wrist."  Dkt. 19 ¶ 215.  The student's boyfriend posted a similar message on social media the following day, this time revealing Farzinpour's name.  Several days later, the student and her boyfriend posted signs listing several male Berklee professors' names, including Farzinpour's, around campus.  The signs were captioned with the text "We will not be silenced." Dkt. 19 ¶ 217.

In the wake of these incidents, the Boston Globe published an article on March 16, 2020 about sexual harassment allegations against several professors at Berklee College, including Farzinpour.  The student who reported Farzinpour posted the Boston Globe article on Facebook and Instagram.  Berklee's President, Roger Brown, sent an email to the Berklee community in response to the Boston Globe article expressing his commitment to eliminating harassment.  The email explained that social media plays an important role in illuminating the experience of survivors, but it also acknowledged that Berklee cannot impose a sanction based solely on a social media post.

**9.   Farzinpour's termination**

Amidst this public discussion of Farzinpour's suspension and the sexual harassment allegations against him, Farzinpour was approached in class by a group of students who questioned him about the sexual harassment.  Farzinpour, in response, maintained his innocence.  Specifically, he alleges:

> Assuring his students that they were not in the company of a sexual predator, he defended himself, explaining that Berklee's finding of responsibility, which had become public in [the student and her boyfriend's] social media posts, was erroneous, and that the Berklee process had been unfair.

Dkt. 19 ¶ 225.

After the chair of the Composition department learned that Farzinpour had spent class time discussing the Title IX investigation against him, he emailed Farzinpour, expressing that he was "surprise[d] and disappoint[ed]" that Farzinpour had decided to discuss the proceedings in class rather than "sticking to the curriculum."  Dkt. 19 ¶ 226.  According to his complaint, Farzinpour responded that he "felt obligated to answer students' questions," and he expressed disappointment that the department chair had not done more to protect him from "false reports and retaliatory action."  Dkt. 19 ¶ 227. Farzinpour was then terminated without any further proceedings on April 2, 2020.

## I.    STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss is used to dismiss complaints that do not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the factual allegations in a complaint must "possess enough heft" to state a claim to relief that is plausible on its face.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  In evaluating the motion, the Court must accept the factual allegations in the plaintiff's complaint as true, construe reasonable inferences in his favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley, 772 F.3d at 71 (citation and internal quotation marks omitted).

## II.  DISCUSSION

### A.  Title IX

In Count I, Farzinpour's complaint alleges that Berklee violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., by rendering an erroneous outcome in his case due to gender bias.  See Doe v. Trs. of Bos. Coll., 892 F.3d 67, 91 (1st Cir. 2018) (explaining the "erroneous outcome" theory of liability under Title IX).  Berklee argues that Title VII preempts Farzinpour's claims of employment discrimination under Title IX. In response, Farzinpour contends that the First Circuit has held that employment-discrimination claims may proceed under Title IX. In Lipsett v. University of Puerto Rico,

864 F.2d 881 (1st Cir. 1988), a case involving a medical resident, the First Circuit concluded that "the Title VII standard for proving discriminatory treatment should apply to claims of sex discrimination arising under Title IX" in the context of employment-discrimination claims. Id. at 897.

Berklee attempts to factually distinguish this case because a resident is a student. Indeed, the court in Lipsett specifically provided that it had "no difficulty extending the Title VII standard to discriminatory treatment by a supervisor in this mixed employment-training context" because the plaintiff in the case was "both an employee *and* a student in the program." Id. (emphasis in original). While the factual context of Lipsett makes its holding less than clear-cut, courts have cited Lipsett for the proposition that Title VII does not preempt employment-discrimination claims brought under Title IX.  See, e.g., Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545, 563 (3d Cir. 2017) (citing Lipsett as evidence of the First Circuit's "decision[] recognizing employees' private Title IX claims"); Summa v. Hofstra Univ., 708 F.3d 115, 131 n.1 (2d Cir. 2013) (declining to address the question of whether a private cause of action for employment discrimination exists under Title IX, but noting that "the First and Fourth Circuits have recognized such a right of action"); Preston v. Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994) (citing Lipsett for the proposition

that the First Circuit was "the only court of appeals to have actually applied Title IX in the employment discrimination context" in 1994); Hauff v. State Univ. of N.Y., 425 F. Supp. 3d 116, 130 n.2 (E.D.N.Y. 2019) ("The First, Third, Fourth, and Tenth Circuit have held that Title VII does not prevent an employee from pursuing employment discrimination claims under Title IX.").

Although the Courts of Appeal are split on the question of whether Title VII preempts employment-discrimination claims under Title IX, the Third, Fourth, and Sixth circuits have decided that employees may proceed with such claims.  See Mercy Catholic Med. Ctr., 850 F.3d at 559–63; Preston, 31 F.3d 205–06; Ivan v. Kent State Univ., 92 F.3d 1185, 1996 WL 422496, at *2 (6th Cir. 1996) (per curiam).  One court within this circuit has held that a private right of action exists for employees under Title IX.  See Bedard v. Roger Williams Univ., 989 F. Supp. 94, 97 (D.R.I. 1997).  The Fifth and Seventh circuits have concluded that no private right of action under Title IX exists for employees.  See Lakoski v. James, 66 F.3d 751, 753–54 (5th Cir. 1995); Waid v. Merrill Area Pub. Sch., 91 F.3d 857, 861–62 (7th Cir. 1996), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009).  The Court finds the reasoning of the majority to be persuasive.

Title IX provides that "[n]o person shall, on the basis of
sex, . . . be subjected to discrimination under any education
program or activity receiving Federal financial assistance."
See 20 U.S.C. § 1681(a) (emphasis added). The plain language of
the statute suggests that Title IX was intended to provide
private recourse for more than just students.  See Mercy
Catholic Med. Ctr., 850 F.3d at 562 (noting "Congress's use of
the expansive term 'person' in § 1681(a)"); see also Bedard, 989
F. Supp. at 97 (describing "Congress' intent for a broad sweep
under Title IX").  For all of the reasons above, the Court
denies Berklee's motion to dismiss Farzinpour's Title IX claims.

**B.   Retaliation**

Farzinpour argues that Berklee retaliated against him for
reporting the student for sexual harassment and for complaining
about bias in Berklee's investigative process, in alleged
violation of Mass. Gen. Laws ch. 151B et seq. and Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)(Counts VII
and VIII of his complaint, respectively).  More specifically, he
alleges that Berklee failed to conduct an impartial
investigation into the student's harassment allegations,
rendered an erroneous finding against Farzinpour after
investigating the student's claims, failed to investigate
Farzinpour's claim that he had been harassed, and disciplined
Farzinpour when he complained about the fairness of the

proceedings. He also claims his termination was in retaliation for his protected activities.

To state a prima facie case of retaliation under Title VII and Mass. Gen. Laws ch. 151B, a plaintiff must demonstrate that "(1) [he] engaged in protected conduct; (2) [he] was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018); see also Mole v. Univ. of Mass., 814 N.E.2d 329, 338-39 (Mass. 2004). The causation element incorporates a "but-for" standard; that is, "a plaintiff must show that the adverse action would not have occurred in the absence of the protected activity." Soni v. Wespiser, 404 F. Supp. 3d 323, 332 (D. Mass. 2019).

In its motion to dismiss, Berklee argues that Farzinpour has failed to allege a plausible causal link between his report of the alleged harassment and any of the above retaliatory actions by Berklee. Farzinpour contends that his decision to speak up about the unfairness of the process to the students who approached him in class was a protected activity. Farzinpour's complaint alleges generally that Berklee took retaliatory action against him as a result of "his repeated expressions that Berklee's investigative process was discriminatory, unfair, retaliatory, and unlawful." Dkt. 19 ¶ 414. And because

Farzinpour was fired, without process, shortly after discussing the allegations of bias with the students, causation could be inferred from the temporal proximity of these two events.  See Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (inferring causation from the fact "that [the plaintiff's] termination occurred shortly after [his] protected conduct"). At this stage, Farzinpour has therefore provided sufficient support for his claim that his termination was retaliatory.  For this reason, the Court denies Berklee's motion to dismiss Farzinpour's retaliation claims based on Title VII and Mass. Gen. Laws ch. 151B.

## C.   **Contract claims**

Berklee seeks to dismiss Counts II and III of Farzinpour's complaint on the basis that they are preempted by Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a). Count II of Farzinpour's complaint alleges that Berklee breached the express and implied terms of Farzinpour's employment contract by, among other actions, failing to conduct a "thorough, impartial, and fair" investigation; failing to gather and consider all relevant evidence during the investigation; failing to provide an equal opportunity to share information; failing to provide access to evidence; failing to apply the "preponderance of the evidence" standard; retaliating against Farzinpour; failing to address retaliation against Farzinpour;

16

failing to conduct a timely review of the complaint against Farzinpour; and failing to conduct any process before terminating Farzinpour.  Dkt. 19 ¶¶ 262–333.  In Count III of his complaint, Farzinpour alleges that his employment contract with Berklee contained an implied covenant of good faith and fair dealing, which was breached because Berklee did not conduct the disciplinary proceedings with "basic fairness."  Dkt. 19 ¶¶ 335, 340.

According to Berklee, because Farzinpour's employment contract comprises his appointment letter, which incorporates the CBA, the LMRA exclusively governs Farzinpour's claims.  Section 301 of the LMRA confers federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce."  29 U.S.C. § 185(a); see also O'Donnell v. Boggs, 611 F.3d 50, 53 (1st Cir. 2010).  The Supreme Court "treats section 301 as a warrant both for removing to federal court state law claims preempted by section 301 and then dismissing them."  O'Donnell, 611 F.3d at 53.  The First Circuit has accordingly made clear that "§ 301 preempts a state-law claim when 'the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement.'"  Haggins v. Verizon New England, Inc., 648 F.3d 50, 54–55 (1st Cir. 2011) (quoting

Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir.
1997)).

A state-law claim may depend on the meaning of a collective
bargaining agreement "if either (1) 'it alleges conduct that
arguably constitutes a breach of duty that arises pursuant to a
collective bargaining agreement,' or (2) 'its resolution
arguably hinges upon an interpretation of the collective
bargaining agreement.'" Id. at 55 (quoting Flibotte, 131 F.3d
at 26). "[A]s long as the state-law claim can be resolved
without interpreting the agreement itself," however, "the claim
is 'independent' of the agreement for § 301 pre-emption
purposes." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S.
399, 410 (1988).

Farzinpour argues that his breach-of-contract claims are
based on Berklee's Equity Policy, and not on the CBA. Thus, he
contends that the Court will not be required to interpret any
terms of the CBA, meaning that Section 301 does not preempt his
claims. In support of this contention, Farzinpour points to the
fact that the Equity Policy states that it applies to "[a]ll
members of the Berkeley community." Dkt. 19 ¶ 36. Based on
this language, Farzinpour argues that the Equity Policy would
apply to him regardless of whether he was subject to a CBA.

He also notes that his appointment letter states that the
appointment was "made in accordance with and governed by the

policies of the Board of Trustees and the College <u>and</u> the
Collective Bargaining Agreement between the College and Berklee
Chapter of the Massachusetts Federation of Teachers Union."
Dkt. 13-1 at 2 (emphasis added).  Because the letter employs the
conjunctive "and" to refer to Berklee's policies and the CBA,
Farzinpour argues that the Equity Policy and the CBA must be
independent of each other.

However, as Berklee points out, Berklee's Equity Policy is
incorporated into the CBA through the CBA's Memorandum of
Understanding #1.  This document states "[t]he parties agree
that effective May 3, 2018, faculty shall be governed by the
college-wide Policy On Relationships Between Faculty/Staff and
Students and Relationships In The Workplace ('Policy on
Relationships') and the college-wide Non-Discrimination,
Harassment, and Sexual Misconduct Equity Policy and Process
('Equity Policy')."  Dkt. 13-2 at 75.  The CBA further provides
that faculty members may grieve adverse outcomes resulting from
the Equity Policy in accordance with the CBA.  Indeed,
Farzinpour himself had grieved the outcome of the process
against him.

Berklee points to a range of decisions suggesting that,
where a CBA expressly incorporates a policy or handbook, claims
based on the handbook may be construed as claims under the CBA.
<u>See</u> <u>Boldt v. N. States Power Co.</u>, 904 F.3d 586, 590 (8th Cir.

2018) ("[I]f an agreement incorporates an employee handbook or
employee-benefit policy by reference, the need to interpret
those other documents in adjudicating a claim can also give rise
to complete preemption."); Garley v. Sandia Corp., 236 F.3d
1200, 1210 (10th Cir. 2001) (rejecting a plaintiff's argument
that his claims were based on his employer's "Personnel Policy,
Code of Ethics, and Director's Memo," and not the CBA, because
the employer's policies were "intended to be read in harmony
with the CBA"); Stuart v. City of Framingham, No. 1:16-CV-12559-
IT, 2020 WL 360552, at *9 (D. Mass. Jan. 22, 2020) (explaining
that, where a CBA impliedly incorporated a policy governing
internal investigations, the plaintiff "cannot assert a claim
for breach of contract or breach of implied covenant of good
faith and fair dealing with respect to the [policy] without
bringing such claim under the CBA").  In the context of these
cases, Farzinpour's claims based on the Equity Policy are
preempted because they are incorporated by reference into the
CBA through Memorandum of Understanding #1.

This conclusion is supported by the fact that the CBA
includes an integration clause, which provides that "[a]ll
rights and duties of both parties are specifically expressed in
this Agreement and such expression is all-inclusive."  Dkt. 13-2
at 74.  The court in Hamilton v. Partners Healthcare Sys., Inc.,
209 F. Supp. 3d 397 (D. Mass. 2016), determined that a

plaintiff's breach-of-contract claims were preempted where the court would be required to determine whether a similar integration clause within a CBA required the CBA to be the sole agreement between the two parties. Id. at 408. Here, similarly, this Court would be required to construe the CBA's integration clause to determine whether Farzinpour might proceed with his claims.

Moreover, Article 14 of the CBA states that Berklee will not provide discipline except for just cause. In Stuart v. City of Framingham, similarly, a CBA between a city and its police union provided that "[n]o employee shall be reprimanded, suspended, discharged or otherwise disciplined except for just cause." 2020 WL 360552 at *9 (alteration in original). When a police officer sued the city for breach of contract, alleging that the city had violated its policy governing internal investigations, the court in Stuart determined that the officer could not bring this claim because the CBA governed termination and discipline of employees represented by the union. Id.; see also Grandison v. Wackenhut Servs., Inc., 514 F. Supp. 2d 12, 17 (D.D.C. 2007) (finding that breach of contract and good faith and fair dealing claims were preempted where the plaintiff claimed that his employer "violated its contractual obligations with respect to 'terminations, disciplinary actions and grievances,'" the terms of which were governed by a CBA).

Farzinpour's claim that Berklee denied him basic fairness is likewise preempted.  Farzinpour contends that Berklee's obligation to comply with the implied covenant of good faith and fair dealing does not stem from the CBA, but rather from the employment contract between Berklee and Farzinpour.  However, the CBA contains an express fairness requirement, providing that, "[t]he parties agree on the importance of prompt, fair, transparent, and thorough investigations, as described in the Policies, including the right of notice to the faculty member of the allegations against them and an opportunity for that faculty member to respond."  Dkt. 13-2 at 75.  Because the CBA promised basic fairness in the proceedings against Farzinpour, the implied covenant of good faith and fair dealing is rendered superfluous by Berklee's express contractual promise of fairness.  See Trs. of Bos. Coll., 892 F.3d at 88 ("[W]henever a school expressly promises no less than basic fairness, . . . the school's implied duty becomes superfluous and the court's analysis to ensure that the disciplinary proceedings were 'conducted with basic fairness' focuses on assuring compliance with the express contractual promise." (quoting Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 725 (1st Cir. 1983))).

## D.   **Estoppel**

Relatedly, Berklee argues that Farzinpour's estoppel claims are preempted by Section 301 of the LMRA because they are tied

to Berklee's alleged breach of the Equity Policy.  For the reasons articulated above, the Court concludes that Farzinpour's estoppel claim are preempted by Section 301.

**E.**     **Negligence and Negligent Infliction of Emotional Distress**

Farzinpour does not oppose Berklee's motion to dismiss his claims for negligence and negligent infliction of emotional distress.  The Court therefore dismisses these claims.

**CONCLUSION**

For all of the reasons set forth above, this Court **DENIES** Berklee's motion to dismiss Farzinpour's Title IX claim, **DENIES** Berklee's motion to dismiss Farzinpour's retaliation claim, and **ALLOWS** Berklee's motion to dismiss Farzinpour's claims based on breach of contract, basic fairness, estoppel, negligence, and negligent infliction of emotional distress.

**ORDER**

SO ORDERED.

                                        /s/ PATTI B. SARIS
                                        Hon. Patti B. Saris
                                        United States District Judge