UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
Peyman Farzinpour,                     )
                                       )
            Plaintiff,                 )      Civil Action
v.                                     )      No. 20-11003-PBS
                                       )
Berklee College of Music,             )
                                       )
            Defendant.                 )
_____)

**MEMORANDUM AND ORDER**

July 12, 2022

Saris, D.J.

**INTRODUCTION**

Plaintiff Peyman Farzinpour, a former associate professor at Berklee College of Music ("Berklee"), alleges that Berklee terminated him because of gender bias after a student complained that he sexually harassed her. He also claims that Berklee reached an erroneous outcome because of gender bias during an investigation of another sexual harassment complaint after his termination.[1]

---

[1] Plaintiff asserts seven counts against Berklee in the Amended Complaint: Berklee reached an erroneous outcome on the student's complaint and subsequently fired him as a result of gender bias in violation of Title IX of the Education Amendments of 1972 (Count I); Berklee retaliated against him for complaining to the Equity Office that this student sexually harassed him and for complaining to his classes that Berklee discriminated against men, in violation of Mass. Gen. L. c. 151B (Count II) and Title VII of the Civil Rights Act of 1964 (Count III); Berklee reached an erroneous outcome on another student's complaint as a result of gender bias in violation of Title IX (Count IV); Berklee's adverse actions stemming from both investigations were the result of gender bias in violation of Chapter 151B (Count V) and Title VII (Count VI); and Berklee subjected Farzinpour to a hostile work environment in violation of Title VII (Count VII). Dkt. 61 at 1-2.

1

Berklee moves for summary judgment on all claims. After hearing, this Court **ALLOWS** the motion with respect to Counts IV and VII and **DENIES** it with respect to Counts I, II, III, V, and VI.

## STATEMENT OF FACTS

When all reasonable inferences are drawn in favor of the non-moving party, Farzinpour, the record supports the following facts. Many of the facts are disputed by Berklee.

### I.   Farzinpour's Version of the Evening of July 24, 2019

Peyman Farzinpour was an associate professor of conducting at Berklee College of Music. He began employment in the fall of 2014. After class in July 2019, one of his students, Mina Alali, asked him to meet to discuss yoga, mindfulness, and meditation. Both Farzinpour and Alali are of Persian descent. They met on July 24, 2019 for pizza in the Prudential Center in Boston. During dinner, Alali showed Farzinpour the cover of a new album she had recorded, which included her picture. Alali asked Farzinpour for his opinion on the album cover. After Farzinpour said it was nice, Alali thrust her chest at him and stated her bra size. Farzinpour replied that "Empirically speaking, by Western society standards, you are an attractive woman." Dkt. 70 at 9-10. Alali also asked Farzinpour whether he sexualizes his students and asked other questions about his sexual boundaries with students. After Farzinpour missed his train home, Alali insisted on going to another establishment. They

went to a dual bar and coffee shop, had one cocktail each, and then went to a third bar in the lobby of a hotel, where they each had two more drinks. At the hotel bar, Alali asked Farzinpour to get a hotel room for them and said "let's go" while pointing to the bathroom. Farzinpour excused himself to go to the bathroom. Id. at 12-13. When Farzinpour returned, Alali suggested that they may do this again next week, kissed him on the cheek three times (one more than the typical Persian custom), and then the two parted ways.

When Alali got home, she gave her boyfriend her account of the evening and recorded the conversation. She stated that she stayed with Farzinpour for over four hours, wanted to discern "what his intentions were," and that her actions looked questionable. Id. at 13-14. She had also recorded the discussions with Farzinpour earlier in the evening, although neither of the recordings are in the record.[2] Over the course of her outing with Farzinpour, Alali told her boyfriend twice by text message that she was "good." Id. After he had left Alali, Farzinpour told his wife about the encounter.

**II.   Alali's Report**

On July 26, 2019, Alali made a report against Farzinpour to Berklee's Equity Office alleging sexual harassment and improper

---

[2] Berklee never listened to the tape-recording of her conversation with Farzinpour because it was illegally obtained under Massachusetts law.

conduct under Berklee's relationships policy. Id. at 14 (Pl. Tab 12, Dep. Ex. 83). She alleged that Farzinpour had made multiple sexually explicit comments to her in a combination of Farsi and English, including that she should come to the bathroom to shake his genitalia. Alali spoke with Jaclyn Calovine, the Deputy for Equity Investigations. Calovine then spoke with Kelly Downes, the Chief Equity Officer/Title IX Coordinator, about the implications of Alali's allegations in the context of the sexual harassment policy. Downes decided that the matter would proceed to an investigation and that a formal complaint would be filed.

### III.  **Next Steps**

Calovine and Downes spoke with Eileen Alviti, the Vice President of Human Resources. The three agreed that it would be appropriate to put Farzinpour on paid administrative leave while the investigation was ongoing because of the severity of the allegations. Downes also spoke with Jennifer Burke, the Senior Director of Employee Relations and Staffing, who concurred. No one in the Equity Office spoke with Farzinpour to learn his version of events prior to the decision to place him on leave and curtail access to his emails.

On July 30, 2019, Downes spoke with Farzinpour to tell him about Alali's complaint and that he was being placed on administrative leave effective immediately. Later that day, Downes emailed Farzinpour notice of the investigation (including his

ability to identify witnesses and submit evidence). The email also reiterated that he was being placed on administrative leave, would be restricted from Berklee systems and activities, and his Berklee email account had been suspended.

On August 5, 2019, Calovine conducted the first interview of Farzinpour for approximately four hours. Farzinpour shared his account of the events of July 24 and had an opportunity to identify witnesses. He expressed concern that the Equity Office was demonstrating gender bias towards men, including through its distributed literature that is "one-sided in support of women." Dkt. 70 at 20. Farzinpour's wife accompanied him to the interview but was not interviewed.

### IV.   <u>Farzinpour's Request to Submit a Complaint Against Alali</u>

In Farzinpour's interview on August 5, 2019, and by email the next day, he asked to file a complaint against Alali for sexually harassing him on July 24. On August 8, Downes replied that Farzinpour was entitled to request that Berklee file a complaint, but she suggested that he raise the issue with Calovine first so that it could be addressed within the existing investigation. That evening, Farzinpour emailed Calovine and Downes, raising concerns that Alali was telling other students about her allegations,[3] asking to be protected from the allegations, and requesting to be

---

[3] On August 2, 2019, Alali approached a group of Berklee students at a local restaurant and bragged that she got Farzinpour fired.

reinstated. Later in the evening, Farzinpour emailed Calovine and Downes stating that he wanted to report sexual harassment and aggression. Farzinpour repeatedly expressed his concern about fairness in the Equity Office. Berklee never filed a complaint against Alali.

Downes met with Chris Kandus-Fisher, the Vice President for Student Affairs, on August 13, 2019. Downes's notes state that Farzinpour was "on leave, no intention to bring back." Dkt. 63 at 11.

On August 16, 2019, Calovine emailed Farzinpour to schedule his second interview and an interview of his wife. Farzinpour replied that he and his wife would be in California until September 5. After further correspondence, Farzinpour stated that he would do a second interview. Farzinpour had provided his wife's contact information in an August 5 email, but his wife was never contacted.

In contrast, Alali's boyfriend was interviewed.

## V.   **Farzinpour's Second Interview**

Calovine interviewed Farzinpour a second time on August 30, 2019, by phone, with his sister (an attorney) serving as his advisor. While he repeated his request to issue a complaint against Alali, Calovine stated that he needed to articulate how Alali's behavior was severe and pervasive enough to create a hostile work environment. Calovine concluded that Farzinpour's claim that Alali harassed him was not supported by a preponderance of the evidence

and the Equity Office never issued a formal complaint. Calovine told Farzinpour that the investigation was done "through the lens of the student." Dkt. 70 at 33.

## VI.   **Calovine's Findings**

Calovine's investigative report concluded that Farzinpour did not violate the relationships policy[4] but that a preponderance of the evidence showed that he violated the sexual harassment policy based on unwanted and unwelcome sexual conduct toward Alali that interfered with her academic performance. Calovine, after considering Alali's comments to her boyfriend, found Alali's explanation that she was feigning interest to determine Farzinpour's intentions to be credible. The report concluded that, on the evening of July 24, 2019, Farzinpour made unwelcome comments calling Alali "hella hot" and "sexy," told Alali something was missing from his marriage, and asked her to go to the bathroom to "shake" his genitalia. Id. at 40. Calovine determined that Alali provided consistent accounts, volunteered disadvantageous information, provided all requested information, and appeared honest. Calovine stated that Farzinpour's explanations were "objectively inappropriate, insufficient, and inconsistent." Id. at 42.

---

[4] Berklee's relationships policy prohibits "dating, romantic, or sexual relationships between students . . . and faculty." Dkt. 63 at 2.

Farzinpour disputes the report's conclusions and points to the recording of Alali's conversation with her boyfriend where she admitted to initiating sexual discussions by saying "I think you are sexually attracted to me," said she was "being such a good actor," and "was testing him." Id. at 40.

Downes made the final decision on sanctions after conferring with Alviti and Burke. She considered the severity of the conduct, the possibility of training, the safety of the community, and prior sanctions for similar violations (which included termination). On December 13, 2019, Downes informed Farzinpour that he would be suspended without pay for thirty days, required to undergo training, prohibited from summer teaching, and banned from using Berklee facilities outside of teaching. Downes's letter notified Farzinpour about his ability to view the report and appeal. She also included a final warning stating "any further violations of Berklee policy or standards of conduct, or willful disregard for expectations, including failure to comply with the training requirements set forth in this letter, will result in the termination of your employment." Id. at 43.

## VII.   Farzinpour's Appeal

Farzinpour appealed on January 7, 2020. He argued that not interviewing his wife was a procedural error; the investigation was not thorough and impartial because it disregarded Alali's admission that she was testing him; Calovine improperly weighed

intent and credibility evidence; Calovine showed bias by including an irrelevant off-color statement (that "the Equity Office should be called 'Fuck White Men In The Ass'"); the investigation took months longer than the 60 days outlined in the Equity Policy; the investigation materially deviated from standard processes; the sanctions were disproportionate; and the investigation overlooked his emails to Alali following up on his yoga and mindfulness recommendations.

The panel unanimously decided that the appeal was meritless after "very specifically looking at errors of due process or procedure." Id. at 45-47. It concluded that the long duration of the investigation was not an issue because the 60-day timeline was just a goal. The panel did not re-weigh the evidence because it did not view its role as rehearing the case. It rejected the argument that Calovine declined to interview Farzinpour's wife because she had made attempts to schedule one. Finally, the panel concluded that the sanction was within the range of prior cases.

## VIII.   Post-Suspension Return to Teaching

Farzinpour returned to teaching on February 20, 2020, after he completed his 30-day suspension.

On February 24, 2020, Farzinpour met with Richard Carrick, his department chair, about "expectations moving forward." Id. at 47. Farzinpour expressed displeasure with the case against him. They discussed "professionalism and teaching the class." Id. at

9

49. Farzinpour asked Carrick to put his requests "in writing" but Carrick failed to do so. Id. at 48. Farzinpour does not recall ever being instructed not to discuss the investigation in class.

On March 1, 2020, Alali publicly posted on social media that she was sexually harassed by a professor, who received "light sanctions" (returning to teach after an investigation found him responsible). Dkt. 63 at 23-24. On March 2, Alali's boyfriend publicly commented on the post using Farzinpour's name. On March 3, Berklee's President Roger Brown reached out to Kandus-Fisher to "understand the circumstances around this investigation and what led to the suspension vs. termination" because the incident with Farzinpour "seems to be coming to the fore as well." Dkt. 70 at 51. On March 11, flyers were posted on and near campus listing Farzinpour and seven other male Berklee professors with the phrase "WE WILL NOT BE SILENCED." Id. at 51. Berklee Public Safety took down the flyers.

On March 11 and 12, 2020, Farzinpour spoke about his harassment case in four different classes. His comments were in response to "student demands." Id. at 52. One student asked, "Why is your name on these posters?" right after Farzinpour started class. Id. Farzinpour described the atmosphere when he arrived at his first class as "horrendously tense . . . [n]obody was talking." Id. Farzinpour believed "mak[ing] them feel safe" by telling them the posters were "wildly wrong" was "the most professional thing

10

[he] could possibl[y] do." Id. Farzinpour also claims that, thereafter, he "answered the questions, as best as [he] could." Id.

On March 16, 2020, the Boston Globe published an article entitled "Sexual harassment allegations against professors set off social media frenzy at Berklee College of Music." Id. at 53; Tab 60, Dep. Ex. 2. The article discussed Alali's social media posts and named Farzinpour alongside other Berklee professors. Alali linked to the article on her public Facebook account, stating "a huge issue that needs to be resolved ASAP." Dkt. 70 at 53.

On March 17, 2020, President Brown wrote to the Berklee community regarding the Boston Globe article and the social media posts from Berklee students. President Brown's letter stated his "unwavering commitment to eliminating harassment and misconduct" by doing "everything within our power." Id. at 54. President Brown's letter encouraged students to report sexual harassment to the Equity Office so it could conduct a "full and fair investigation . . . using our equity process." Id. at 53.

This was not the first time Berklee's sexual harassment track record had come under media scrutiny. Years prior, on November 8, 2017, the Boston Globe had published an article highlighting sexual abuse at Berklee by faculty members. Shortly after, President Brown spoke to the Berklee community about its commitment to preventing harassment through fair processes and a "zero tolerance" approach.

Id. at 77. On November 13, the Boston Globe published an article on President Brown's speech titled "11 faculty members have been terminated in 13 years for sex assault, harassment." Id.

## IX.   Student Complaint About Farzinpour's Class Discussions

On March 23, 2020, a professor covering one of Farzinpour's classes told Carrick about two students who mentioned Farzinpour talking about his investigation in class. One student requested video resources to prepare for the midterm because one of the two classes with Farzinpour was not spent on the course material.

Also on March 23, a female student went to the Equity Office and reported that Farzinpour used an hour of class to discuss the investigation into his conduct. The student reported that Farzinpour had made negative comments about the equity process and Alali. She stated that Farzinpour was asked why his name was on the posters and Farzinpour responded "yes, I want to address this." Dkt. 70-44 at 3. Farzinpour went on to argue "why he's not guilty, that the institution is out to get white men." Id. The student reported that she was "furious that the whole class was taking space" for the conversation and it "fe[lt] uncomfortable remaining in the class." Id. Lee Cherry from the Equity Office forwarded the intake report to Downes and Burke on March 24, 2020. On March 25, 2020, Carrick covered one of Farzinpour's classes and multiple students stated that Farzinpour had spent an hour and a half of the previous class talking about his investigation.

12

## X.   **Berklee Decides to Fire Farzinpour**

On March 25, 2020, at about 4:00 p.m., Carrick emailed Downes that a faculty member covering Farzinpour's class received multiple complaints about his use of class time. Within fifteen minutes, the Senior Director of Employee Relations and Staffing, Jennifer Burke, emailed Alviti the Equity Office intake report with the subject line "New PF Concern." Dkt. 70 at 62; Dkt. 70-46 at 3-4. Alviti immediately asked whether Farzinpour should be terminated. A minute later, Burke replied that she thought they should terminate him.

At 4:24 p.m. on the first thread, Burke told Downes that it may be time to fire Farzinpour based on his use of class time. Dkt. 70 at 62; Dkt. 70-48 at 2. At 4:26 p.m. on the "New PF Concern" thread, Burke told Alviti she would wait until hearing from Downes to make a recommendation and that she wanted to consult with someone else before terminating. Alviti responded at 4:28 p.m. agreeing with Burke's plan and including a draft email stating that Farzinpour directly violated instructions from his supervisor about using class time. Burke agreed to send Alviti's draft after Carrick confirmed that he directly told Farzinpour not to discuss the allegations against him in class.

On March 26, 2020, Carrick obtained and forwarded Burke more information about the student comments regarding Farzinpour's use of class time. Also on March 26, Carrick and Burke spoke about

terminating Farzinpour for violating his final warning. Carrick stated that termination would be the next step, and that he would reach out to Farzinpour. On March 27, the Provost reached out to President Brown stating the Farzinpour would be fired on Monday (March 30).

On March 30, 2020, after the decision was made to terminate Farzinpour, Carrick emailed Farzinpour saying that he had spent time in multiple classes discussing the allegations against him. Carrick asked why he did not stick to the curriculum. Farzinpour wrote back saying that the students directly asked him what happened, he had to explain the situation, he had a right to answer student questions, and that he did stick to the curriculum even during classes where his situation was discussed. Carrick and Burke discussed Farzinpour's response by phone. The President, Provost, and Dean Nicholl were fully behind the decision to terminate Farzinpour.

On April 2, 2020, Carrick sent the termination letter to Farzinpour. The letter stated that Farzinpour had been given a final warning about remaining professional and using class time for the curriculum, yet he discussed the allegations against him and criticized Berklee institutions in class. The letter acknowledged Farzinpour's belief that his behavior was justified but suggested that there were other ways to relieve student concerns without using class time.

14

## XI.   Roe Investigation

On March 11, 2020, Jane Roe, a recent Berklee, graduate, submitted an online report to the Equity Office. She alleged that between Spring and Fall 2018, while she was Farzinpour's student, he harassed her repeatedly. She said he told her during office hours that she was "one of the hottest girls at Berklee." Dkt. 70 at 54. She also stated that he asked her inappropriate questions: "what are your favorite sex positions? Do you swallow? Do you refer to a penis as a cock?" Id. Her report also recounted an instance where Farzinpour "grabbed her wrist, arm, and shoulders and made her walk with him to the train station, refusing to let her leave, made her sit with him, made her feel uncomfortable and asked her if he made her nervous." Id. Roe said that after she told her close friends, Farzinpour "aggressively" asked why she was spreading lies about him and said she "knew better." Id. at 54-55.

Downes met with Roe regarding her allegations and, on March 19, 2020, issued a notice of investigation letter to Farzinpour. Downes told Farzinpour that he would be placed on paid administrative leave effective immediately, and that he would again be suspended from his email and campus access. Berklee appointed an independent investigator, attorney Allyson Kurker, who also interviewed Roe the following week.

Farzinpour was terminated on April 2, 2020, but Kurker proceeded with her investigation. She interviewed nine witnesses

including Farzinpour (twice), Farzinpour's wife (the only witness Farzinpour identified), and Roe. Kurker also obtained text messages, emails, social media posts, and other documents.

During his interviews and in a written statement, Farzinpour raised concerns about Roe's behavior. He told Kurker that in 2018, Roe had encountered Farzinpour and his wife outside of class in a hallway at Berklee. Roe asked him and his wife to kiss, which they did. Farzinpour told Kurker that his wife was made uncomfortable by the interaction. Roe made Farzinpour uncomfortable by sparking conversations about personal romantic topics and calling Carrick attractive. Farzinpour reported that he had unsuccessfully sought to minimize contact with her. He encouraged Roe to take classes with other professors and tried to avoid personal topics. Nevertheless, Farzinpour noted that Roe took multiple classes with him in different semesters, frequented his office hours, and tried to get him to increase her grades. He agreed that Roe had accompanied him to Back Bay train station, but asserted that he had not done anything improper.

After Kurker produced a draft investigative report, Farzinpour reviewed and responded to it. He denied many of the allegations made by Roe, stated that he did not previously know that he could submit non-first-hand witnesses, and asked to name additional witnesses.

16

Kurker put out a finalized report on August 8, 2020. The report found that it was more likely than not that Farzinpour had violated the sexual harassment and retaliation policy. Kurker concluded that Farzinpour made unwelcome sexual contact with Roe when he repeatedly called her "hot," asked her graphic sexual questions, coerced her to come to Back Bay Station with him, and commented on other female students' appearances and clothing. Kurker concluded that Farzinpour's actions were severe and pervasive, led Roe to feel helpless and scared, and caused her to try avoiding meetings with her professor. Kurker credited Roe's explanation that scheduling conflicts had forced her to enroll in his classes and that she hoped to reduce her contact with him despite being in his classes. Kurker further concluded that Farzinpour intimidated Roe by admonishing her not to tell others about his treatment of her.

Kurker found Roe more credible than Farzinpour. She observed that multiple contemporaneous statements from Roe to witnesses corroborated her accounts. Kurker also found that Farzinpour's account of the hallway kiss incident was exaggerated and he never reported it until after Roe filed her claim.

Kurker sent Farzinpour a letter finding him responsible for sexual harassment and retaliation and told him he could view the report and appeal. Downes concluded that the findings would have

justified termination if Farzinpour were still employed at Berklee.

On September 4, 2020, Farzinpour appealed. He claimed that the investigation processes were not followed and the hypothetical sanction was out of step with other cases. Farzinpour argued that Kurker improperly credited Roe's statements about class scheduling conflicts and that Kurker refused to interview additional witnesses Farzinpour requested in response to the draft report. On October 19, the appeal officer, Christopher Reade, informed Farzinpour that the panel denied his appeal because Kurker took reasonable steps to assess other course options for Roe and found Roe's explanations to be plausible. The panel also did not take issue with the use of non-first-hand witnesses and found that the sanction against Farzinpour was appropriate based on other cases.

On October 23, 2020, Farzinpour emailed the Equity Office to file a complaint against Roe for asking him to kiss his wife. Farzinpour complained that Kurker didn't report the incident to Berklee when Farzinpour raised it during an interview and didn't consider his complaint to be a complaint of sexual harassment. Downes told him Berklee would not start a complaint because this sole instance would be insufficient to interfere with his work, even if taken as true. Farzinpour responded to Downes that Roe's action interfered with his job, occurred in public, embarrassed him, affected his authority with students, caused him distress,

18

and made him feel lesser as a professor. Downes's assessment was unaffected. She believed the charge did not meet the definition of sexual harassment because it was a single incident that would not (as viewed by a reasonable person) have interfered with his work. She also felt that the Equity Process was an inappropriate venue to bring a claim against an alum after Farzinpour had been fired.

## XII.   **The Equity Policy**

Berklee's Equity Policy "prohibits sexual harassment and retaliation, among other conduct, and sets forth a process to investigate and adjudicate complaints alleging violations of the Policy." Dkt. 63 at 1-2. The policy applies to "all members of the Berklee community," and to "[r]eports by third parties against a current member of the Berklee community, where, in the Chief Equity Officer/Title IX Coordinator's sole discretion, the conduct described in the complaint constitutes a sufficient present or future risk to the Berklee community to warrant further review." Id. at 2. Berklee has a detailed process for evaluating equity complaints that involves preliminary determinations, interim measures, and written notice requirements. The process vests substantial discretion in members of the Equity Office but also grants a right to appeal.

**LEGAL STANDARD**

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts construe the record in the light most favorable to the nonmovant. See Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc., 999 F.3d 37, 43 (1st Cir. 2021) (citing Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015)). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). If the moving party shows the absence of a disputed material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

"[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009). Moreover, "'the mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (quoting Anderson, 477 U.S. at 252); Kahan v. Slippery Rock Univ. of Pennsylvania, 50 F. Supp. 3d 667, 684–85 (W.D. Pa. 2014), aff'd, 664 F. App'x 170 (3d Cir. 2016) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986))

("The nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . [T]he dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor.").

## DISCUSSION

### I.   Count I – Title IX - Alali

Plaintiff alleges that Berklee discriminated against him based on gender when it suspended him after a flawed investigation into Alali's sexual harassment complaint.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a). Title IX was intended to provide private recourse for employees as well as students. See Doe v. Mercy Cath. Med. Ctr., 850 F.3d 545, 562 (3d Cir. 2017); see also Bedard v. Roger Williams Univ., 989 F. Supp. 94, 97 (D. R.I. 1997). Berklee does not dispute at this stage that professors are entitled to protection under Title IX.

To succeed on an erroneous outcome claim, a plaintiff must show: "(1) particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) "a causal connection between the flawed outcome and gender bias." Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994). The First Circuit makes clear that plaintiffs must

show specific evidence that "gender bias was a motivating factor in the disciplinary process." Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 74 (1st Cir. 2019) (quoting Trs. of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018)).

The Second Circuit has issued helpful cases on point. In Vengalattore v. Cornell Univ. 36 F.4th 87, 106 (2d Cir. 2022) involving a Title IX claim by a professor accused of sexual harassment, the Second Circuit held that gender bias may be inferred when the following four factors are all met: the school "made findings against the accused male that were 'incorrect and contrary to the weight of the evidence'"; failed to follow its procedures to protect the accused; failed to seek out potential witnesses; and faced criticism for not addressing female complaints against males. Id. at 106 (reversing a district court's order allowing a motion to dismiss). In Doe v. Columbia Univ., 831 F.3d 46, 56–57 (2d Cir. 2016), it held that the evidence "substantially favor[ed]" a different outcome than the evaluator concluded, the school "failed to act in accordance with" its own procedures, the school endured pressure to vindicate female student complaints, and the school declined to seek out potential witnesses Plaintiff had identified. See also Menaker v. Hofstra Univ., 935 F.3d 20, 33–34 (2d Cir. 2019) (finding that the school had undergone a "clearly irregular investigat[ion]" that "completely disregarded" its own process, faced criticism about

vindicating female students' complaints, failed to seek out witnesses, and the Vice President of the school "knew" that at least one of the accusations was deliberately false).

Plaintiff contends the investigatory process had numerous flaws. First, he highlights that Berklee did not give sufficient weight to the audio recording of Alali and her boyfriend where she stated that she was "such a good actor," was "testing him," that she stayed out for "four plus hours" to ascertain "what his intentions were," and she "indulg[ed] in the drinks he ordered." Dkt. 70 at 14, 38-41. She also showed him a suggestive photo on the cover of her album. Dkt. 69 at 5-6. In his view, she admitted she was trying to sexually attract him.

Second, Plaintiff complains that Calovine's decision to conduct the investigation "through the lens of the student" demonstrated gender bias. Dkt. 70 at 20. She did not pursue Plaintiff's claims against Alali for the same events and therefore declined to view his allegations through an equally favorable lens.

Third, Plaintiff argues that Berklee did not fairly pursue evidence on his behalf. For example, he points out that Calovine did not interview his wife but did interview Alali's boyfriend.

Fourth, Plaintiff contends that Berklee prejudged the case. Berklee placed him on administrative leave before notifying or interviewing him. Downes wrote an internal note in August 2019 that Plaintiff was "likely to be held responsible." Id. at 26.

Fifth, Plaintiff notes that external pressure skewed the investigation against him in favor of Alali. He argues that the posters around Back Bay, media attention (including from the Boston Globe), and social media tumult led to an investigation with a pre-ordained outcome.

Berklee responds to each of these contentions. First, Berklee argues that Calovine reviewed the recording of Alali speaking to her boyfriend, asked Alali about it, and ultimately found Alali to be credible when she said that she was only seeking to determine Plaintiff's intentions.

Second, Berklee argues that a bias in favor of students over faculty (or of complainants over the accused) does not relate to gender. See Doe v. Univ. of Denver, 952 F.3d 1182, 1196 (10th Cir. 2020) ("Most courts to have addressed the issue have concluded that evidence of a school's anti-respondent bias does not create a reasonable inference of anti-male bias . . . . We agree."); Doe v. Harvard Univ., 462 F. Supp. 3d 51, 62 (D. Mass. 2020); Doe v. Univ. of Mass.-Amherst, No. CV 14-30143, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015). Because the set of faculty members is a group that can contain people of any gender, Berklee argues bias against faculty is not sufficient for evidence of gender bias. Cf. Univ. of Denver, 952 F.3d at 1196 (quoting Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1176 (10th Cir. 2001)) ("[Under Title VII] evidence of an employer's

24

discriminatory treatment of a group to which both genders can belong does not give rise to an inference of gender discrimination . . . . 'Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.'"). In fact, Berklee points out it has used a substantially similar process in a case against a female professor.

Third, Berklee argues that it had made an effort to interview Plaintiff's wife but decided that it was ultimately not necessary because it fully credited Plaintiff's description of what he told her.

Fourth, Berklee argues that it placed Plaintiff on administrative leave based on the nature of Alali's allegations and the statement that he was "likely to be held responsible" was merely a preliminary assessment.

Fifth, Berklee denies that either gender bias or external pressure (by the media and on campus) influenced the outcome.

When the evidence is seen in the light most favorable to Plaintiff, Plaintiff has presented particular facts which cast an articulable doubt on the accuracy of the outcome of the disciplinary proceeding and particular circumstances that gender bias was a motivating factor behind the erroneous outcome. Of particular concern is the evidence that Berklee reached an erroneous outcome because during the investigation the student admitted both that she was testing Plaintiff to determine his

sexual intent and that her actions looked "questionable." Dkt. 70 at 38.

## II.   <u>Count IV – Title IX – Roe</u>

Plaintiff alleges that Berklee violated Title IX because it reached an erroneous outcome as a result of gender bias during the investigation of Roe's complaint of sexual harassment. To determine whether the outcome was motivated by gender bias, the Court again looks at the <u>Vengalattore</u> factors. 36 F. 4th at 106.

First, while the facts asserted were disputed, no reasonable factfinder would determine that Berklee's credibility findings were contrary to the weight of evidence. For starters, the investigator was an attorney who was independent of Berklee, so she was not involved in the earlier investigation. Kurker concluded that Plaintiff's description of the hallway incident became increasingly exaggerated during the investigation; Roe had no motivation to lie; Roe's account was more plausible than Plaintiff's; and multiple witnesses corroborated Roe's account through contemporaneous statements.

Second, Plaintiff argues that the investigation of Roe's claims against Plaintiff was improper because neither Roe nor Plaintiff was affiliated with Berklee for most of it. However, Plaintiff was still on the faculty when the complaint was issued, and Roe was interviewed by Kurker before Plaintiff was terminated. Berklee's policy states that it "applies generally" to "all members

of the Berklee community" and to reports "by third parties against a current member of the Berklee community where, in the Chief Equity Officer/Title IX Coordinator's sole discretion, the conduct described in the complaint constitutes a sufficient present or future risk to the Berklee community to warrant further review." Dkt. 70 at 4 (citing Dkt. 70-16 at 2). Because plaintiff was (and still is) seeking reinstatement and the alleged offense of harassment occurred while he was a professor, Berklee did not violate its policy.[5]

Third, the investigation was not one-sided. Kurker interviewed Plaintiff's wife, the only specific witness he advanced. While Plaintiff asked to be allowed to name additional non-first-hand witnesses after the draft report came out, he did not name any specific witnesses or identify how their accounts would aid the investigation.

Fourth, Plaintiff notes that Berklee never filed his sexual harassment complaint against Roe. Four months after he had been found responsible for harassing her and retaliating against her, Plaintiff asked that a complaint be initiated against Roe for asking him to kiss his wife. Over Plaintiff's protest, Downes concluded that, even taking the allegation as true, Plaintiff would not be able to show that the single request unreasonably interfered

---

[5] There is no claim that Berklee violated a contractual obligation it owed to Plaintiff. Cf. Sonoiki v. Harvard Univ., No. 20-1689, 2022 WL 2128619, at *14 (1st Cir. 2022).

with his work. Additionally, Downes reasonably decided that the Equity Process was not an appropriate venue for a former professor to assert a claim against a former student.

Fifth, Plaintiff points out the public pressure Berklee faced from media coverage and widely distributed posters that accused its professors of sexual harassment. The Boston Globe article about Alali and other allegations led to President Brown's letter about the school's commitment to eliminating harassment and pursuing fair investigations. This factor weighs against Berklee because it was subject to criticism about its treatment of sexual harassment of students.

In light of the above factors, only one of which weighed in Plaintiff's favor, no reasonable fact finder could find that the investigation involving Roe was gender-biased in violation of Title IX. Plaintiff's allegations in Count IV do not survive summary judgment.

### III.    Counts V and VI – Title VII and M.G.L. Chapter 151B – Gender Discrimination

Plaintiff alleges gender discrimination under Chapter 151B of the Massachusetts General Laws (Count V) and Title VII of the Civil Rights Act of 1964 (Count VI).

The court applies the well-known McDonnell Douglas burden-shifting framework in both Title VII and Chapter 151B cases. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, a

Plaintiff must make a prima facie case for employment discrimination. A prima facie case for Title VII discrimination is demonstrated by showing (1) membership in a protected class, (2) the employee met the employer's expectations, (3) the employee suffered adverse employment action, and (4) similarly-situated employees outside the protected class received more favorable treatment. See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018).

Step two shifts the burden to Defendant to produce evidence that the employment actions were taken for "legitimate, nondiscriminatory reason[s]." Id. (quoting Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012)).

At step three, Plaintiff must prove, by a preponderance of the evidence, that Defendant's explanation is "a pretext for unlawful discrimination." Id. (quoting Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 221 (1st Cir. 2007)). Notably, throughout the three-step framework, only the burden of production changes; the burden of persuasion always remains with the plaintiff. See id. at 89 (quoting Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 57 n.4 (1st Cir. 2018)).

At step one, gender is the relevant protected characteristic and Plaintiff suffered an adverse employment action. Plaintiff has provided evidence that he was qualified for his job as a professor of conducting.

At step two, Berklee offers the legitimate, nondiscriminatory justification that the adverse employment actions were a result of Plaintiff's sexual harassment of Alali and his improper use of class time.

At step three, the plaintiff must point to some evidence that the stated reason was "pretextual and that the actual reason is discriminatory." Taite v. Bridgewater State Univ., Bd. of Trustees, 999 F.3d 86, 94 (1st Cir. 2021). The same evidence that supports the Title IX claim supports the allegations here.

Therefore, counts V and VI survive summary judgment.

## IV.   Counts II and III – Title VII and M.G.L. Chapter 151B – Retaliation

Plaintiff's primary retaliation claim is that he was terminated for criticizing gender bias in Berklee's investigation.[6] Berklee argues that his termination was appropriate because he misused class time in violation of warnings he had received.

The Plaintiff must make a prima facie case that he engaged in protected activity, suffered adverse employment consequences, and that there was a causal connection between the two. See Noviello

---

[6] Plaintiff also argues that he was retaliated against for raising a sexual harassment claim against Alali and that Berklee took adverse actions against him by putting him on leave and failing to file his harassment claim or take other action against Alali. However, these claims fail because they are "largely conclusory and lacking in the concrete documentation necessary to prove the causal link." Pearson v. Massachusetts Bay Transp. Auth., 723 F.3d 36, 42 (1st Cir. 2013) (quoting, Ramos v. Roche Prods. Inc., 936 F.2d 43, 49 (1st Cir. 1991)). The relatively light sanctions for conduct Plaintiff was found responsible for in the Alali matter, the elapsed time and intervening events before the supposed retaliation, and Berklee's documented reasons for its actions defeat Plaintiff's claims.

v. City of Bos., 398 F.3d 76, 88 (1st Cir. 2005). "'[P]rotected activity' refers to action taken by the plaintiff 'to protest or oppose statutorily prohibited discrimination.'" Bettencourt v. Town of Mendon, 334 F. Supp. 3d 468, 490 (D. Mass. 2018) (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009)). Title VII requires "that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013); Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 530 (Mass. 2011).

There is no dispute that Plaintiff complained about the investigation conducted by Berklee's Equity Office in his classes. As a general matter, complaints about impermissible gender discrimination constitute protected protest. See Bettencourt, 334 F. Supp. 3d at 490. However, if his speech interfered with his job performance, the activity would not have been protected. See Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 233 (1st Cir. 1976) (Title VII "does not afford an employee unlimited license to complain at any and all times and places.").

The parties dispute whether Plaintiff was given a warning about discussing his case in class. They also dispute whether the curriculum was adequately covered. The timing of internal emails supports a reasonable inference that the precipitating events for Plaintiff's termination were his in-class statements that were critical of Berklee's investigation. The factual question of

whether the termination was retaliation for complaining about the school's alleged gender bias or his violation of an order must be resolved in Plaintiff's favor at this stage. Therefore, summary judgment is denied.

## V.   <u>Count VII – Title VII – Hostile Work Environment</u>

Plaintiff claims that Berklee is liable under Title VII for creating a hostile work environment. Plaintiff points to five activities that allegedly created a hostile work environment: (1) Berklee's non-investigation of Plaintiff's sexual harassment complaint; (2) imposing administrative leave; (3) not disciplining Alali for speaking to other students about her allegations; (4) erroneously finding Plaintiff responsible in the investigations; and (5) firing Plaintiff in retaliation for criticizing the proceedings. <u>See</u> Dkt. 69 at 25.

Hostile work environment claims under Title VII exist when a "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Kosereis v. Rhode Island</u>, 331 F.3d 207, 216 (1st Cir. 2003) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). To establish a hostile work environment claim, Plaintiff must demonstrate:

> (1) that [he] is a member of a protected class; (2) that
> [he] was subjected to unwelcome harassment; (3) that the
> harassment was based on [his] membership of the

protected class; (4) that the harassment was so severe
or pervasive that it altered the conditions of [his]
employment and created an abusive work environment; (5)
that the objectionable conduct was objectively and
subjectively offensive, such that a reasonable person
would find it hostile or abusive and the victim in fact
did perceive it to be so; and (6) that some basis for
employer liability has been established.

Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 39 (1st Cir. 2007)

(citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st

Cir. 2001)).

Even allegedly "baseless, improper, and biased
investigation[s]" do not necessarily "constitute the frequent,
severe, physically threatening or psychologically humiliating
activity necessary to sustain a hostile work environment claim."
Norloff v. Virginia, 173 F.3d 424 (4th Cir. 1999). Even if a jury
found that the investigation of Alali's claim and Plaintiff's
subsequent termination were the result of gender bias, Berklee's
actions were not so pervasive and severe as to create a hostile
work environment. Plaintiff also points to sexualizing conduct by
Alali as well as comments by student on social media, but there is
no evidence that Berklee caused this conduct, encouraged it, or
was deliberately indifferent to it. Roy v. Correct Care Sols.,
LLC, 914 F.3d 52, 72 (1st Cir. 2019). Indeed, Berklee took down
the posters around campus and cautioned Alali not to discuss the
case (even though it believed her statements did not violate any
policies). This claim fails to survive summary judgment.

## ORDER

For the reasons set forth above, the Court **ALLOWS** Defendant's motion for Summary Judgment with respect to Counts IV and VII and **DENIES** it with respect to Counts I, II, III, V, and VI.


SO ORDERED.

/s/ Patti B. Saris
Hon. Patti B. Saris
United States District Judge